SHELL OIL COMPANY, Union Oil Company, Robert Van Meter, Van's Wholesale Auto Body Shop, and Margaret G. Smith, Appellants/Cross–Appellees–Defendants,

v.

Richard and Kim MEYER, Gary and Bridget McDaniel, Jim and Terri McDonald, Dan and Vivian McDaniel, Alvin and Verna Mae Casad, and Helena Byers, Appellees/Cross–Appellants–Plaintiffs.

No. 79A04–9512–CV–470.

Court of Appeals of Indiana.

Aug. 19, 1997.

506

Karl L. Mulvaney, Nana Quay–Smith, Larry J. Kane, Phil L. Isenbarger, Bingham Summers Welsh & Spilman, Indianapolis, James A. Knauer, Gregory P. Cafouros, and Marcia E. Roan, Kroger, Gardis & Regas, Indianapolis, for Appellants.

G. William Frick, M. Elizabeth Cox, Washington, DC, Frank C. Capozza, Katz & Korin, Indianapolis, Thomas Sayre Llewellyn, Washington, DC, for Amicus Curiae American Petroleum Institute.

Lewis E. Willis, Jr., Stark, Doniger & Smith, Indianapolis, Alphonse M. Alfano, Bassman, Mitchell & Alfano, Chtd., Washington, DC, for Amicus Curiae Indiana Oil Marketers Association.

Robert M. Baker, III, Thomas A. Barnard, Johnson, Smith, Pence, Densborn Wright & Heath, Indianapolis, Peter M. Racher, Jeffrey D. Featherstun, Plews, Shadley, Racher & Braun, Indianapolis, for Appellees.

Peter Lehner, Erik Olson, New York City, for Amicus Curiae Natural Resources Defense Council, Inc.

Dimitri G. Daskal, Annapolis, MD, Mark R. Waterfill, Leagre & Barnes, Indianapolis, for Amicus Curiae National Coalition of Petroleum Retailers.

Eric L. Mayer, Indianapolis, for Amicus Curiae Hoosier Environmental Council.

Sue A. Beesley, Sheila M. O'Bryan, Indianapolis, for Amicus Curiae City of Indianapolis.

## OPINION

CHEZEM, Judge.

### Case Summary

Defendants–Appellants, Shell Oil Company ("Shell") and Union Oil Company ("Union"), (collectively, the "Oil Companies"), appeal from a judgment entered by the trial court in favor of Plaintiffs–Appellees, Richard and Kim Meyer, Gary and Bridget McDaniel, Jim and Terri McDonald, Dan and Vivian McDaniel, Alvin and Verna Mae Casad, and Helena Byers (collectively, the "Landowners"). Citing an allegedly improper jury instruction, the Landowners request a new trial regarding the issues determined by the jury. We affirm in part, and reverse and remand in part.

### Issues

The parties present various issues which we restate as:

I. Whether collateral estoppel bars liability against the Oil Companies under the Indiana Underground Storage Tank Act ("USTA");

II. Whether Shell and Union are "operators" as the term is defined in the USTA;

III. Whether the fact that the Landowners are not liable for corrective actions precludes them from having a cause of action for contribution under the USTA;

IV. Whether the trial court's allocation of liability between Shell and Union is proper;

V. Whether the Landowners are barred from recovering costs for future corrective action under the USTA;

VI. Whether medical monitoring costs are corrective action costs recoverable under the USTA;

VII. Whether the attorneys' fee award is appropriate; and,

VIII. Whether the Landowners are entitled to a new trial because of the trademark instruction.

### Facts and Procedural History

The facts favorable to the judgment indicate that in 1946, Fred Smith ("Smith") purchased property in West Point, Indiana, on the northwest corner of Washington and Main, to be used as a gas station. From the time of purchase until 1971, Smith leased the West Point gas station to various people who operated it as a Shell station, complete with Shell signage and Shell gasoline. During the next twenty-five years Smith owned the gas station, he also drove the tank truck that transported the Shell gasoline from a bulk plant in Lafayette to his station, filled the three underground storage tanks beneath the station with gasoline, held himself out as a Shell agent, wore a Shell uniform, displayed the Shell name and logo on his tank truck, and attended Shell-sponsored sales meetings and conferences.

In 1971, the bulk plant from which Smith had been acquiring gasoline switched from providing Shell gasoline to providing Union 76 gasoline. Thus, Smith's station changed from being a Shell station to a Union 76 station that year. As a result, Union paid to have the Shell signs removed from the station and replaced with Union signs, and paid for 500 bottles of Coca–Cola to help celebrate its grand opening. From 1971 until his death in 1979, Smith wore a Union 76 uniform, displayed the Union name and logo on his tank truck, and delivered Union gasoline to the station. From 1979 through 1981, the final two years the Union station was in business, another Union distributor supplied the station with gasoline.

In early 1989, West Point resident Kim Meyer first noticed the smell of petroleum in her family's drinking water. She reported the odor to the Tippecanoe County Health Department, which sampled and tested the Meyers' water. Laboratory results showed the presence of benzene at a concentration of 180 parts per billion. The Health Department warned the Meyers to stop drinking or washing with the water because it was unsafe. Meyers, her husband, and their three children avoided baths at home, began using bottled water for cooking and drinking, and purchased filters to screen out contaminants in their well water.

Several months later, the Indiana Department of Environmental Management ("IDEM") installed carbon filters in 4–foot-high canisters in the Meyers' home. Upon further testing, IDEM found that residential water in the neighborhood contained quantities of benzene, 1,2–dichloroethane, and other gasoline constituents. After determining that drinking or being exposed to the unfiltered water would be unsafe, IDEM installed similar filters in the homes of the other Landowners who lived nearby. Thereafter, IDEM hired an environmental consulting firm to conduct a study of the groundwater in the Landowners' neighborhood, in the hopes of finding the contaminant source.

In 1992, the consulting firm finally determined that the contamination was coming from the property that had formerly been the West Point Shell/Union 76 gas station. By then, the underground storage tanks at the gas station had been excavated pursuant to IDEM's request of the current site owner, Robert Van Meter ("Van Meter"). Soil in the pit where the tanks had been buried was tested and found to be heavily contaminated with petroleum hydrocarbons. The contaminated soil had not been removed, and the excavation pit had been refilled with contaminated backfill after the tanks were excavated.

After making unsuccessful demands for clean up of the contamination, the Landowners filed suit on May 4, 1993 against Shell, Union, Van Meter and his autobody shop, and Smith's widow. The complaint consisted of six counts: Count I (liability under the USTA), Count II (liability under anti-dumping statute, Ind.Code § 13–7–11–6(c)), Count III (negligence), Count IV (trespass), Count V (nuisance), and Count VI (strict liability for an abnormally dangerous activity). Although originally named as defendants only under Counts III–VI, Shell and Union were later added by the Landowners as defendants under the USTA count as well.

At a pre-trial conference in September of 1994, the parties suggested that the USTA claim was equitable in nature and should be decided separately by the court after disposition of the Landowners' common law claims by a jury. The court agreed and a jury trial was scheduled for Counts III–VI. Following an unsuccessful attempt by the Oil Companies to have the case removed to a federal district court, the jury trial began in Tippecanoe County. The jury trial lasted from October 3, 1994 through October 16, 1994 when the jury returned a general verdict in favor of the Oil Companies on all four counts.

On February 7, 1995, Shell, Union, and the Landowners each filed a separate motion for summary judgment. The trial judge denied each one and set the claim for bench trial on July 5, 1995. When the parties made it clear that they had no further evidence on the USTA issue, the judge agreed to make a preliminary determination of liability. On May 16, 1995, the trial court issued an opinion [1] adjudging that the Landowners "are not

---

1. By the time the trial judge was to make his preliminary decision regarding Count I, the

estopped from litigating their claim under the UST Act, and further determin[ing] that Shell and Union are liable under the UST Act as UST operators." (R. 2676). The trial judge then ordered the following:

1. [The Landowners'] motion for partial summary judgment on Count I of the Second Amended Complaint is granted.

2. [The Oil Companies'] motions for summary judgment on Count I are denied.

3. Shell and Union shall pay the reasonable corrective action expenses as may be incurred by [the Landowners] in cleaning up groundwater and soil contamination emanating from the former West Point station. Shell and Union shall divide the expenses based on their respective duration of operation of the former station over the 35 years spanning 1946 through 1981. Shell (1946 to 1971 = 25 years) shall pay 70 percent of the expenses; Union (1971 to 1981 = 10 years) shall pay 30 percent.

4. Shell and Union shall pay the reasonable attorney fees and expenses incurred by [the Landowners] in bringing that action, pursuant to the UST Act. Shell and Union shall divide the attorney fees and expenses on a 70:30 basis, as set forth in the preceding paragraph.

5. Within 30 days of the date of this Order, [the Landowners] shall file a proposed Work Plan setting forth the corrective action to be performed by [the Landowners] to remediate the groundwater and soil contamination in West Point, consistent with applicable environmental statutes and rules. The Work Plan shall include a detailed description of the investigation conducted by [the Landowners] in preparing the Work Plan and shall identify as specifically as possible all tasks to be accomplished in conducting the corrective action; the timetable for completion of each task; and the estimated cost of each task.

6. [The Landowners] also shall file within 30 days of the date of this Order an application for attorney fees incurred in bringing this action for contribution, pursuant to the UST Act. The application shall itemize all corrective action expenses [the Landowners] have thus far incurred.

7. Within 20 days following the filing of [the Landowners'] proposed Work Plan and application, Shell and Union shall file such objections to [the Landowners'] Work Plan and application as [the Oil Companies] deem appropriate.

8. The Court will review [the Landowners'] proposed Work Plan and application and such objections thereto as may be filed by [the Oil Companies], and the Court shall take such further action as is appropriate. This Order shall not be final until the Court has determined the appropriate scope of the corrective action to be conducted in West Point and has entered an order directing Shell and Union to pay specific amounts as contribution to fund the corrective action.

(R. 2677–78).

In response, the Landowners filed a petition requesting legal fees of $845,588.75 through May 31, 1995, and litigation expenses of $109,028.28. The Landowners also requested that Shell and Union pay for the corrective action identified in their proposed corrective action work plan for remediation of groundwater and soil contamination. The Landowners' plan allocated $2.4 million for environmental corrective action, $132,124.00 for human health corrective action, $91,070.00 for corrective action performed to date, and $250,000.00 as a conservative estimate of future legal fees for implementing future corrective action.

Shell and Union filed a joint objection to the Landowners' petition for attorneys' fees and expenses, and to their environmental plan. Shell and Union also submitted their own proposed environmental plan which estimated cleanup costs to be $209,300.00. The trial judge held a bench trial on these issues on July 11–13, and 19, 1995. On July 13, 1995, Shell filed a motion for reconsideration of the trial court's May 16, 1995 order, specifically challenging the 70/30 liability breakdown. No formal ruling on Shell's motion for reconsideration was issued. On August 23, 1995, the Landowners filed a supplement to their petition for attorneys' fees and expenses, which raised the total to $976,799.50

Landowners had settled their Count II claim against Smith's widow and Van Meter.

for attorneys' fees and $179,322.40 for costs. Shell and Union objected to this latest petition.

On September 27, 1995, the trial court issued extensive findings of fact, conclusions of law and judgment in favor of the Landowners on Count I. In its order, the trial court incorporated by reference its May 16 opinion, found Shell and Union liable under the USTA, and ordered them to pay the following amounts:

1. To [the Landowners], the sum $2,743,660.21, representing the estimated cost of corrective action required in West Point, Indiana, as a result of the release of gasoline from USTs at the former Shell/Union gas station site.

[The Landowners] shall keep these funds on deposit in an interestbearing account at a federally insured depository institution, such funds to be used solely and exclusively for the environmental and human health corrective action tasks described in [the Landowners'] corrective action plans and discussed in this decision. [The Landowners] may draw upon the funds for corrective action tasks without notice to the Court or to [the Oil Companies]. However, [the Landowners] shall file detailed status reports once each calendar month with the Court, with copies served upon all counsel of record, identifying (1) all amounts withdrawn during the prior month, (2) the amount of money remaining on deposit, (3) all anticipated tasks and purposes for which the monies will be expended, (4) the status of the implementation of the soil and groundwater remediation systems discussed in [the Landowners'] corrective action plan, (5) the status of [the Landowners'] implementation of a plan of medical monitoring for themselves and their children, (6) the anticipated timetable for further corrective action tasks, and (7) such other information as may be relevant and useful to the Court in overseeing the implementation of [the Landowners'] corrective action plans.

2. To [the Landowners'] counsel, the sum $1,459,721.25 representing [the Landowners'] counsel's reasonable fees, and the sum $179,350.70 representing reimburse-ment for litigation expenses incurred to and including August 23, 1995.

3. Costs shall be allowed in favor of [the Landowners] and against [the Oil Companies] in the 70:30 proportion set forth in the Court's May 16, 1995 order. (R. 3986–87).

All parties appeal, but for different reasons.

## Discussion and Decision

### I. Collateral Estoppel

The Oil Companies assert that the essential element of Count I—the Oil Companies' operator status—was fully and fairly litigated before the jury, and was decided adversely to the Landowners. Specifically, their argument is as follows: (1) the jury found in favor of the Oil Companies on all common law counts, including Count VI (strict liability for an abnormally dangerous activity); (2) unless the jury believed that Shell and Union did not control the West Point gas station, it could not have found for the Oil Companies on Count VI; (3) in order to be an operator under the USTA, a party must have control over the gas station; (4) under the doctrine of collateral estoppel, the jury's implicit determination about control on Count VI precludes a finding that Shell and Union are liable as operators under the USTA.

■■■ The doctrine of res judicata consists of two concepts, claim preclusion and issue preclusion. *Biggs v. Marsh,* 446 N.E.2d 977, 981 (Ind.Ct.App.1983). The issue preclusion branch of res judicata is also referred to as collateral estoppel. *Progressive Casualty Ins. Co. v. Morris,* 603 N.E.2d 1380, 1382 (Ind.Ct.App.1992). Issue preclusion bars the subsequent relitigation of the same fact or issue where that fact or issue was *necessarily adjudicated* in a former suit and the same fact or issue is presented in a subsequent action. *Kieler v. C.A.T. by Trammel,* 616 N.E.2d 34, 36 (Ind.Ct.App. 1993), *trans. denied,* (emphasis added); *Sullivan v. American Casualty Co. of Reading, Pa.,* 605 N.E.2d 134, 137 (Ind.1992). Where issue preclusion applies, the previous judgment is conclusive only regarding those issues *actually litigated and determined*

therein. *Kieler,* 616 N.E.2d at 36 (emphasis added).

> The estoppel of a judgment does not extend to matters not expressly adjudicated and which can be inferred only by argument, except where there are necessary and inevitable inferences, in the sense that the judgment could not have been rendered as it was without deciding such points. There is no estoppel where anything is left to conjecture as to what was necessarily involved and decided, as where the judgment, which might have been based upon one of several grounds, does not show upon which ground it was based.

*Peterson v. Culver Educational Foundation,* 402 N.E.2d 448, 461 (Ind.Ct.App.1980). A trial judge's decision to disallow the use of collateral estoppel will be reversed only upon a showing of an abuse of discretion. *Wilcox v. State,* 664 N.E.2d 379, 381 (Ind.Ct.App. 1996).

■ Here, in order for issue preclusion to apply, the USTA's definition of "operator" must have been adjudicated in the jury trial. It was not. Indisputably, the jury was not instructed on Count I (the USTA claim). Specifically, the jury was not advised regarding the definition of an "operator" under the USTA, nor was it instructed regarding Indiana's environmental policies. Instead, the jury was instructed regarding the common law actions. The court's strict liability instruction never mentioned "control" or "responsibility." While it is true that the respondeat superior instruction mentioned "control," control in that sense is not necessarily the same as control or responsibility under the USTA.

Moreover, the jury rendered a general verdict in favor of the Oil Companies. By its nature, a general verdict does not allow us to know exactly why the jury reached its verdict. Accordingly, we do not know precisely why the jury determined that the Landowners' common law claims should fail. Regarding the strict liability count, the control element may not have been the deciding factor. The jury might have concluded that Shell and Union were not carrying on an abnormally dangerous activity. The instruction defined such an activity as "the storage of

gasoline in underground storage tanks in close proximity to drinking well." Perhaps the jury did not think the Oil Companies stored gasoline, but rather only supplied gasoline. Alternatively, the jury may have determined that the underground tanks were not sufficiently close to the Landowners' home to be in close proximity to their wells. This theory is supported by the fact that the jury requested the use of a dictionary in order to look up the meaning of "proximity." In any event, there is no estoppel where anything is left to conjecture as to what was necessarily involved and decided, as where the judgment, which might have been based upon one of several grounds, does not show upon which ground it was based. *See Peterson,* 402 N.E.2d at 461.

■■ Further, the Oil Companies' present contention of collateral estoppel is directly contrary to what they argued to the district court in attempting removal. At the district court, the parties debated whether Shell's and Union's removal petition was timely in light of federal statutes imposing an absolute requirement in diversity cases that the removal occur no later than one year following "commencement of the action." Shell and Union argued that by amending the complaint on August 26, 1994 to add Shell and Union as defendants under Count I, the Landowners had launched an "entirely new and distinct cause of action" that triggered a fresh 12–month period in which to remove the case on diversity grounds. In their joint notice of removal, the Oil Companies stated:

> Under well established Indiana law, the Second Amended Complaint constituted the commencement of a new action (the "New Action") against Shell Oil Company and Union Oil Company because the Second Amended Complaint contained an entirely new and distinct cause of action, not previously contained in any pleading in the Lawsuit, against the Defendants.

(R. 2330). In their brief in support of their joint notice of removal, the Oil Companies added:

> Plaintiffs' Second Amended Complaint stated a cause of action against Shell Oil Company and Union Oil Company, not

previously contained in any other complaint or pleading, demanding contribution and attorney's fees under the Indiana Underground Storage Tank Act.... To support their claim under the Indiana Underground Storage Tank Act, Plaintiffs must establish (1) that Shell Oil Company and Union Oil Company are responsible parties under the Act; (2) the actual corrective action costs incurred; (3) the attorney's fees incurred in advancing the contribution claim; (4) the reasonableness of those attorney's fees; and [5] the proper allocation of the corrective costs between the defendants and any responsible non-parties. The same evidence will not support Plaintiffs' original claims against Shell Oil Company and Union Oil Company, and their newly asserted equitable claim against the two defendants. *Furthermore, a judgment on the claims originally asserted against Shell Oil Company and Union Oil Company will not be a bar to Plaintiffs' claim under the Indiana Underground Storage Tank Act.* Moreover, the same measure of damages does not govern Plaintiffs' original claims and their contribution claim, and the claims are not subject to the same defenses. Therefore, Plaintiffs' Second Amended Complaint stated a new and different cause of action.

(R. 2292) (citation omitted) (emphasis added). Because the Oil Companies' present argument is inconsistent with its prior one, the doctrine of judicial estoppel precludes the present one. "Judicial estoppel prevents a party from assuming a position in a legal proceeding inconsistent with one previously asserted." *Shewmaker v. Etter*, 644 N.E.2d 922, 931 (Ind.Ct.App.1994), *adopted*, 659 N.E.2d 1021 (Ind.1995). The fundamental premise of judicial estoppel is to protect the essential integrity of the judicial process. *Id.* In view of the above, we are unpersuaded that the trial court's decision to disallow the use of collateral estoppel was an abuse of discretion.

## II. "Operator"

While the parties agree that the Oil Companies are not "owners" under the USTA, they disagree as to whether the Oil Companies may be included within the definition of "operator." As such, they present an issue of first impression. The Oil Companies contend that they were mere wholesale suppliers of gasoline, and thus did not exercise sufficient control to be deemed operators. In contrast, the Landowners argue that the trial court's conclusion to the contrary is amply supported by the facts presented and by the applicable law.

■■■■ A trial court's judgment based upon special findings and conclusions will be reversed only when clearly erroneous. Ind.Trial Rule 52(A); *Monroe Financial Corp. v. DiSilvestro*, 529 N.E.2d 379, 381 (Ind.Ct.App.1988), *trans. denied.* A judgment is clearly erroneous if not supported by the conclusions of law. Conclusions of law are clearly erroneous if unsupported by the findings of fact. *Hvidston v. Eastridge*, 591 N.E.2d 566, 568 (Ind.Ct.App.1992). Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Vanderburgh County Bd. of Commissioners v. Rittenhouse*, 575 N.E.2d 663, 665 (Ind.Ct.App.1991), *trans. denied.* When determining whether the findings or judgment are clearly erroneous, we consider only the evidence most favorable to the judgment and the reasonable inferences flowing from the evidence. *Id.* Special findings are adequate only if sufficient to support a valid legal basis for the judgment. *Metropolitan Dev. Comm. of Marion County v. Goodman*, 588 N.E.2d 1281, 1285 (Ind.Ct.App.1992).

### A. Statutory Language and Construction

According to the USTA, a person who:

undertakes corrective action resulting from a release from an underground storage tank, regardless of whether the corrective action is undertaken voluntarily or under an order issued under this chapter, IC 13–23–14–1, IC 13–7–20–19 (before its repeal), or IC 13–7–20–26 (before its repeal); is entitled to receive a contribution from a person who *owned or operated* the underground storage tank at the time the release occurred. A person who brings a successful action to receive a contribution from an owner or operator is also entitled to receive reasonable attorney's fees and

court costs from the owner or operator. An action brought under this subsection may be brought in a circuit or superior court. In resolving a contribution claim, a court may allocate the cost of a corrective action among the parties to the action using equitable factors that the court determines are appropriate.

Ind.Code § 13–23–13–8(b) (emphasis added). The definition of "owner" is relatively self-explanatory, but specifically does not include a person who does not participate in the management of an underground storage tank, is otherwise not engaged in the production, refining, and marketing of regulated substances, and holds indicia of ownership primarily to protect the owner's security interest in the tank. Ind.Code § 13–11–2–150. "Operator" is defined as a person *in control of, or having responsibility for, the daily operation of an underground storage tank.* Ind.Code § 13–11–2–148(d) (emphasis added). We are asked to determine the meaning of this definition within the USTA.

 When the meaning of a statute is at issue, we follow several rules of statutory construction. *See* Ind.Code § 1–1–4(1). We do not and may not interpret a statute that is facially clear and unambiguous. Rather, we give the statute its plain and clear meaning. *Skrzypczak v. State Farm Mut. Auto. Ins.,* 668 N.E.2d 291, 295 (Ind.Ct.App.1996). Additionally, when construing a statute, the legislature's definition of a word binds us. When the legislature has not defined a word, we give the word its common and ordinary meaning. *Id.* In order to determine the plain and ordinary meaning of words, courts may properly consult English language dictionaries. *Ashlin Transp. Servs., Inc. v. Indiana Unemployment Ins. Bd.,* 637 N.E.2d 162, 167 (Ind.Ct.App.1994). If a statute is ambiguous, we seek to ascertain and give effect to the legislature's intent. *Skrzypczak,* 668 N.E.2d at 295. In doing so, we read an Act's sections as a whole and strive to give effect to all of the provisions, *id.,* so that no part is held meaningless if it can be reconciled with the rest of the statute. *JKB, Sr. v. Armour Pharmaceutical Co.,* 660 N.E.2d 602, 605 (Ind.Ct.App.1996), *trans. denied.* Further, we presume that our legislature intended its language to be applied in a

logical manner consistent with the statute's underlying policy and goals. *Walling v. Appel Service Co., Inc.,* 641 N.E.2d 647, 651 (Ind.Ct.App.1994).

### B. Indiana's Legislative Intent

Although the meaning of "daily operation of an underground storage tank" is relatively straightforward, the rest of the definition of "operator" is anything but facially clear and unambiguous. Moreover, our legislature has defined neither "control" nor "responsibility" for purposes of Ind.Code § 13–11–2–148. Accordingly, before we consult dictionaries for common meanings of these terms, we set out Indiana's underlying environmental policy or intent, which may be gleaned from the following explicit purposes of Title 13:

(1) to provide for evolving policies for comprehensive environmental development and control on a statewide basis;

(2) to unify, coordinate, and implement programs to provide for the most beneficial use of the resources of Indiana; and

(3) to preserve, protect, and enhance the quality of the environment so that, to the extent possible, future generations will be ensured clean air, clean water, and a healthful environment.

Ind.Code § 13–12–3–1. In addition, our legislature specifically provided: "Being necessary for the public health, safety, and welfare, this [environmental] title shall be liberally construed to effectuate the purposes of this title." Ind.Code § 13–12–2–1.

### C. Control or Responsibility

One of the various definitions of "control" is "to exercise restraining or directing influence over." Webster's Third New International Dictionary (1976) p. 496. Thus, in examining whether Shell and Union were in control of the daily operation of the underground storage tanks at the West Point station, we ask whether the Oil Companies were exercising restraining or directing influence over the daily operation of the USTs.

 The facts indicate that the Oil Companies did direct some influence over various aspects of the West Point station. For in-

stance, inspections were conducted. Standards of presentation, cleanliness, and legality were set and enforced. Indeed, during the early 1970s, the Oil Companies forced stations, including the West Point station, to stop selling leaded gasoline pursuant to EPA regulations. However, the Oil Companies did not exert influence over all aspects of the West Point station—let alone on a daily basis. Viewing the evidence most favorable to the judgment, we cannot say the Landowners have shown that the Oil Companies actually exercised control or influence (as the words are commonly used) over *the daily operation of USTs* at the West Point station. As such, the Oil Companies do not fall within the "control" part of the definition of operator. Thus, we next examine the "responsibility" prong.

"Responsibility" has been defined as "moral, legal, or mental accountability." Webster's Third New International Dictionary (1976) p. 1935. Therefore, in examining whether Shell and Union had responsibility for the daily operation of the underground storage tanks at the West Point station, we ask whether the Oil Companies had legal accountability for the daily operation of the USTs. The accountability/responsibility inquiry requires a more complicated analysis than the "control" inquiry. Looking at the relevant facts, without more, will not lead us to a definitive resolution of the question of whether the Oil Companies were "responsibility" operators of the West Point station under the USTA. Thus, keeping in mind Indiana's explicitly stated environmental intent as well as the common meaning of "responsibility," we take a closer look at the history of the USTA before delving into the relevant facts.

In response to the national threat to groundwater caused by leaking USTs, the United States Congress enacted new UST regulations as part of the 1984 amendments to the Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. § 6901, et seq. In 1987, Indiana's General Assembly enacted the USTA as Ind.Code § 13–7–20–1, et seq.[2]

The primary purposes of the USTA are to create a state registration system for USTs, to provide a statewide fund of last resort to assist with UST cleanups, and to give IDEM the power to write rules and take enforcement action with regard to UST violations. *See* § 13–23–1–1 *et seq.* To achieve these purposes, the Indiana legislature drew from RCRA's UST provisions. Thus, many of the definitions of the USTA, including the definitions for "owner" and "operator" are taken directly from RCRA. However, the USTA's cost recovery provision, formerly Ind.Code § 13–7–20–21(b), is unlike any provision in RCRA.

[The USTA] allows a current owner (or any other person) to undertake corrective action voluntarily and then seek contribution.... The [USTA] was intended to identify responsible parties and provide an effective method for the state to remediate *existing* hazardous conditions caused by petroleum releases.... An analogy to interpretations of the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, is apposite because Indiana's UST statutes follow the same remedial principles established by CERCLA.... Indiana's UST laws fill a gap in CERCLA. A petroleum release is not affected by CERCLA, because petroleum does not qualify as a "hazardous substance" under CERCLA. Indiana's UST laws, drafted in the same language and spirit of CERCLA, were intended to provide a mechanism for effectively administering remediation of sites contaminated by petroleum releases.... The [Indiana] statute was intended to apply to any site contaminated by petroleum releases, regardless whether the release occurred after the effective date of the statute.

*The Pantry, Inc. v. Stop–N–Go Foods, Inc.,* 777 F.Supp. 713, 720–21 (S.D.Ind.1991) (emphasis in original), *modified on denial of reconsideration,* 796 F.Supp. 1164 (1992). The legislature intended the statute to pro-

---

**2.** The original version of 13–7–20–21(b) allowed UST owners and operators to recover corrective action costs from third parties who were alleged to be responsible for a release of petroleum. In

1991, the USTA was amended to permit *any person* to receive a contribution for corrective action costs from a person who owned or operated the UST at the time the release occurred.

mote future corrective action. *Id.* at 721. Since the USTA drew from both RCRA and CERCLA, the history and case law regarding each of the two federal statutes is helpful.

Although the RCRA definition of operator could have been limited to only those in control of the daily operation of USTs, a separate group of operators was added. Those "having responsibility" for the daily operation of USTs were also included as operators under RCRA. In using similar language for the USTA definition of operator, the Indiana legislature retained the two groupings of operators, or potentially liable persons, under the USTA. Thus, under the USTA, a person who is not in control of the daily operation of a UST may still be liable for cleanup if that person has responsibility for the daily operation of that UST.

■ Due to the dearth of cases interpreting who has responsibility as an operator under either the USTA or RCRA, and because of its similar remedial purposes, we look to who has responsibility or authority as an operator under CERCLA. "The most commonly adopted yardstick for determining whether a party is an owner-operator under CERCLA is the degree of control that a party is able to exert over the activity causing the pollution." *CPC Intern., Inc. v. Aerojet–General Corp.*, 731 F.Supp. 783, 788 (W.D.Mich.1989). *See also Hillsborough County v. A & E Road Oiling Service, Inc.*, 853 F.Supp. 1402 (M.D.Fla.1994) (holding franchisor could be liable as an operator due to its authority to control the waste-related activities of its franchisee). Thus, in order to be an operator for CERCLA purposes, a defendant "need not have exercised actual control" over a facility "so long as the authority to control the facility was present." *City of North Miami, Florida v. Berger*, 828 F.Supp. 401 (E.D.Va.1993) (citing *United States v. Carolina Transformer Co.*, 978 F.2d 832, 836–37 (4th Cir.1992)). Such a definition

"properly declines to absolve from CERCLA liability a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup." *Nurad, Inc. v. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.1992), *cert. denied sub nom, Mumaw v. Nurad, Inc.*, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). The authority to control standard prevents a responsible person from insulating himself from liability by standing idle. *Berger*, 828 F.Supp. at 409.[3]

Evidence was presented that Shell and Union understood that steel USTs are subject to corrosion; that steel USTs eventually leak; that leaks were impossible to prevent (prior to 1980s technology); that slow leaks were virtually impossible for the on-site gas station employees to detect (with the primitive dipstick method); that the solution to the problem required significant engineering knowledge and resources beyond the limits of most gas station owners; and that small amounts of gasoline leaking into groundwater over a long time can pollute an entire community's drinking water with benzene, a human carcinogen. Accordingly, large oil marketers took two significant steps: (1) they began to discover, prevent and remediate contamination from leaking USTs through technology and training of their directly-owned stations (but provided no similar technology or training for the independently owned stations); and (2) in the 1970s and early 1980s, they attempted to avoid liability by requiring local retailers to purchase the tanks which had previously been owned by the oil marketers.

■ Viewing the above evidence in a light most favorable to the judgment and recalling the Oil Companies' success in forcing independent stations to stop selling leaded gasoline, we agree that Shell and Union had the authority and ability to control the

**3.** *Cf. Sidney S. Arst Co. v. Pipefitters Welfare Educational Fund*, 25 F.3d 417, 420–22 (7th Cir.1994); *Donahey v. Bogle*, 987 F.2d 1250, 1254 (6th Cir.1993), *vacated on another issue, Livingstone v. Donahey*, 512 U.S. 1201, 114 S.Ct. 2668, 129 L.Ed.2d 805 (1994); and *United States v. Kayser–Roth Corp.*, 910 F.2d 24 (1st Cir.1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). In each of these cases, the courts were asked to determine the extent of protection provided by a corporate structure and the courts used an actual control test in resolving issues of operator liability. In contrast, the present case is not a corporate veil type case, thus the aforementioned cases are inapposite.

USTs at the West Point station. Consequently, they had the responsibility, or accountability, for the daily operation of the USTs at the West Point station. As such, they fall within USTA's definition of operator. Having reached this conclusion, we reiterate the words of our supreme court:

> A business should bear its own costs, burdens, and expenses of operation, and these should be distributed by means of the price of the resulting product and not shifted, particularly, to small neighboring property owners for them to bear alone. We can understand no sensible or reasonable principle of law for shifting such expense or loss to persons who are not involved in such business ventures for profit.

*Haseman v. Orman,* 680 N.E.2d 531, 535 (Ind.1997) (quoting *Enos Coal Mining Co. v. Schuchart,* 243 Ind. 692, 697, 188 N.E.2d 406, 408 (1963)). Although used in a different context, the *Haseman/Enos* rationale is an additional compelling reason to conclude that Shell and Union are operators.[4]

### III. Landowners Not Precluded from Contribution

The Oil Companies next argue that the Landowners do not have a cause of action for contribution under the USTA because the Landowners themselves are not liable for corrective action. That is, Shell and Union argue that a contribution claim requires that the person seeking contribution must be liable in common with the person from whom the contribution is sought. In support, the Oil Companies discuss the testimony of certain legislators as well as the common law notion of contribution.

"When legislation is susceptible to several widely different constructions, a court may look to the journals of the two legislative bodies to infer legislative intent." *O'Laughlin v. Barton,* 582 N.E.2d 817, 821 (Ind.1991). Yet, in "interpreting statutes, we do not impute the opinions of one legislator, even a bill's sponsor, to the entire legislature unless those views find statutory expression." *A Woman's Choice–East Side Women's Clinic v. Newman,* 671 N.E.2d 104, 110 (Ind.

1996). The legislature is presumed to know the common law and to incorporate it into the statute except where it expressly indicates otherwise. *Joe v. Lebow,* 670 N.E.2d 9, 20–21 (Ind.Ct.App.1996). Thus, we are again drawn back to the USTA's language.

In relevant part, the USTA states, "[a] person" who undertakes corrective action, regardless of whether the corrective action is undertaken voluntarily or in response to an IDEM order, is entitled to receive a contribution from a person who owned or operated the underground storage tank at the time the release occurred. Ind. Code § 13–23–13–8(b)(2). By using "[a] person" rather than "a liable person," the legislature chose not to limit recovery only to those persons who themselves were liable. This interpretation is supported by Judge Tinder's opinion that the USTA "allows a current owner (*or any other person*) to undertake corrective action" and seek contribution. *Pantry,* 777 F.Supp. at 720 (emphasis added); *see also Wright Motors, Inc. v. Marathon Oil Co.,* 631 N.E.2d 923, 927 (Ind.Ct. App.1994) (stating that Wright filed an "action to recover costs of remediation, brought pursuant to statutory authority of the USTA, and the common law theories of contribution and waste," thus, implying that common law contribution is not the same as contribution under the USTA.).

Furthermore, to adopt the Oil Companies' interpretation of the USTA would be to contravene the explicit purposes of Indiana's environmental statutes. Shell's and Union's reading of the USTA would not "preserve, protect, [or] enhance the quality of the environment so that, to the extent possible, future generations will be ensured clean air, clean water, and a healthful environment." *See* Ind.Code § 13–12–3–1; *cf. Medical Disposal Services, Inc. v. Indiana Dep't of Envtl. Management,* 669 N.E.2d 1054, 1060 (Ind.Ct.App.1996), *trans. denied.* In contrast, our reading of who may bring an action under the USTA is consistent with Ind.Code § 13–12–2–1's mandate that we liberally con-

---

4. This is not to say that petroleum refiners and/or suppliers who *do not* have the ability to control a tank's daily operations will have potential liability under the USTA.

strue the USTA to effectuate the purposes of Indiana's environmental statutes.[5]

## IV. Allocation between Shell and Union

Shell[6] next challenges the trial court's 70/30 allocation of liability. Shell argues that the trial court's allocation should be vacated because: (1) the trial court sua sponte decided the issue, thus depriving Shell of an opportunity to argue the issue; (2) there was no evidence supporting the trial court's allocation; and (3) the trial court's allocation was improperly based upon a market share liability theory.

In response, the Landowners point out that Ind.Code § 13–23–13–8(b) provides, "[i]n resolving a contribution claim, a court may allocate the cost of a corrective action among the parties to the action using equitable factors that the court determines are appropriate." They also cite Judge Najam's opinion that an appellate court "should not disturb a trial court's exercise of equitable discretion where the facts and circumstances support equitable relief." *Sizemore v. H. & R. Farms, Inc.*, 638 N.E.2d 455, 458 (Ind.Ct. App.1994) (concurring in part, dissenting in part), *trans. denied.* The Landowners assert that in view of the stipulation that the West Point station was a Shell station for twenty-five years (from 1946 through 1971) and a Union station for ten years following that time, the trial court's 70/30 allocation is both objective and eminently reasonable.

Although we recognize that when an action sounds in equity, particular deference must be given to the trial court, *Smith v. Potter*, 652 N.E.2d 538, 542 (Ind.Ct.App.1995), *trans. denied,* for the reasons outlined below, we are persuaded that at least part of Shell's challenge to the allocation determination has validity. We reach this conclusion whether we analyze this issue in summary judgment terms or in a T.R. 52(A) context.[7]

Liability under the USTA depends upon whether a person owned or operated the UST from which the release occurred during the time when the release occurred. Nothing more is required to find liability. On the other hand, allocation of corrective action costs is a separate determination following a finding of liability. Allocation of costs among parties to an action involves the consideration by the court of such "equitable factors that the court determines are appropriate." Ind.Code § 13–23–13–8(b). These equitable factors are not germane to the basic liability question.

The trial court's April 20, 1995 order stated, "[b]y agreement of counsel, the Court will make a preliminary determination of *liability* as to Count I no later than May 1, 1995." (R. 2618) (emphasis added). The order did not mention that the allocation issue would also be decided. Accordingly, Shell did not prepare an argument addressing allocation, what specific equitable factors might be relevant to an allocation among the parties, or what evidence would be germane to the application of such equitable factors to this case. Instead, Shell focused upon the basic operator liability issue, as well as the estoppel issue which had been disputed.

Indeed, no party designated any evidence regarding the allocation issue. Within the Landowners' memorandum and exhibits in support of their summary judgment motion, they neither briefed the allocation issue nor presented any evidence of the issue. Further evidence that the allocation issue was not yet truly at issue is contained in the beginning of the forty-plus page May 16, 1995 memorandum opinion itself. In that opinion, the trial court stated:

---

5. *State ex rel. Gary Taxpayers v. Lake Superior Court*, 225 Ind. 478, 76 N.E.2d 254 (1947), *overruled on other grounds*, 272 Ind. 421, 399 N.E.2d 356 (1980), and the other cases cited by the Oil Companies are distinguished in that they do not involve the interpretation of a remedial statute.

6. Union does not challenge the allocation of liability.

7. The procedural posture of this case was a bit unusual. The May 16 order not only granted the Landowners' partial summary judgment motion on the issues of collateral estoppel and "operator" status, but also dealt with separate issues, one of which was the allocation issue. Four months later, the entire May 16 order was incorporated by reference into the September 27 findings, conclusions, and judgment.

This cause is before the Court on the cross-motions of the parties for summary judgment on Count I under the [USTA]. *There are two issues before the Court:*

··1. *Are [Landowners] collaterally estopped* from litigating Count I in light of the jury's general verdict in favor of [the Oil Companies] on Counts III, IV, V and VI?

2. If [Landowners] are not estopped, *are [the Oil Companies] liable as "operators"* under the [USTA] for contribution toward corrective action required at the West Point gas station?

(R. 2631) (emphases added). In its conclusion, the trial court answered those two questions when it "adjudge[d] that [Landowners] are not estopped from litigating their claim under the UST Act, and further determine[d] that Shell and Union are liable under the UST Act as UST operators." (R. 2676). Nowhere at the beginning, in the very detailed discussion, nor in the adjudgment section of the May 16 order did the trial court say anything about allocation. Yet, the trial court then included the following paragraph toward the end of its May 16 order:

3. Shell and Union shall pay the reasonable corrective action expenses as may be incurred by [the Landowners] in cleaning up groundwater and soil contamination emanating from the former West Point station. Shell and Union shall divide the expenses based on their respective duration of operation of the former station over the 35 years spanning 1946 through 1981. Shell (1946 to 1971 = 25 years) shall pay 70 percent of the expenses; Union (1971 to 1981 = 10 years) shall pay 30 percent.

(R. 2677). Thus, in addition to addressing the estoppel issue and the operator issue, the trial court sua sponte decided the allocation issue—despite giving no notice that it would do so.

■■■ To change a court order without affording counsel, who relied upon the original order, ample notice of such a change and adequate opportunity and time to prepare constitutes an abuse of discretion. *Town of Portage v. Clifford,* 254 Ind. 443, 260 N.E.2d 566, 572 (1970) (holding that trial court abused its discretion by reinstating hearing after granting continuance with ineffective notice to defendant's counsel); *cf. Jones v. Berlove,* 490 N.E.2d 393, 395 (Ind.Ct.App. 1986) ("no provisions in the Trial Rules authorize the entry of summary judgment sua sponte, and the practice should be used only rarely and with caution. The paramount consideration is whether the party against whom summary judgment has been entered had notice and adequate opportunity to prepare and present materials in opposition.").

■■■ Although the procedural context of this case is different than that in *Portage* or *Berlove,* the rationale from those cases is applicable. Shell had no advance notice that the trial court's decision on preliminary liability would also reach the allocation issue. As such, Shell did not present evidence in its defense and was prejudiced thereby.[8] In view of the above, the allocation issue should

---

8. There was evidence of a general nature about USTs and when they may leak. For example, "[t]ypically studies show that after about five years to ten years of operation, gas stations leak in one way or another." (R. 4798). However, as demonstrated by the following colloquy, there was no evidence as to when the USTs at the West Point station began leaking:

Q.· ... Is it not true that you have no specific knowledge about the tanks at this station? Is it not true that you do not know specifically that these tanks were leaking in 1950?
A. That's correct.
Q. Is it not true that you do not know specifically whether these tanks were leaking in 1965?
A. That's correct.
Q. Is it not true that you do not specifically know that these tanks were leaking in 1975?
A. That's correct.
Q. Isn't it true that you really have no specific information about this station's tanks as to when that might have started leaking?
A. The summary of data, the entirety of data as I see them today, make me conclude not only that the tank and the pipelines in the island, in the, in the delivery lines, that both these areas leaked. But also that the leak had happened many years ago in order for the contaminates to have been found where they were in 1989.
Q. Well that's not my question, doctor. My question is when, can you tell me 1950, 1960, 1970, can your tell me when?
A. No, I cannot.
(R.5142–43).

be remanded for briefing and an evidentiary hearing.

### V. Future Corrective Action Costs

The Oil Companies next contend that "the costs of future corrective action, which are wholly speculative, may not be recovered under the guise of contribution." They claim that their liability must be limited to the costs actually incurred by the Landowners to date. In support, they rely upon the common law meaning of contribution, the testimony of certain legislators, the *Pantry* case, and general notions of efficiency.

Having already determined that the meaning of contribution as used in the USTA is different than the common law idea of contribution, and recognizing the problems inherent in imputing the opinions of legislators to the entire legislature, we review the USTA's language. In relevant part, the USTA provides that a person who "undertakes corrective action . . . is entitled to receive a contribution. . . ." Ind.Cod § 13–23–13–8(b). "In resolving a contribution claim, a court may allocate the cost of a corrective action among the parties to the action using equitable factors that the court determines are appropriate." *Id.* The statute as written does not limit contribution to past-incurred costs.[9]

The relevant section does not state that a person who undertakes corrective action is entitled to receive a contribution *only after the actions are taken.* Yet, that type of language must be read into the USTA in order to interpret the USTA as the Oil Companies do. According to the Oil Companies' approach, various results are possible. A person with substantial funds available could remediate the entire contaminated site, then attempt to sue for contribution—which may or may not be successful. Those who do not have at their disposal the considerable monetary resources necessary to remediate the entire site could attempt to remediate and collect contribution in a piece-meal fashion, returning to court each time a bit more was remediated. The more likely result is that

cleanup of contaminated sites simply would not happen. Thus, once again, the Oil Companies' reading of the USTA contravenes the explicit purposes of Indiana's environmental statutes. Shell's and Union's reading of the USTA would not "preserve, protect, [or] enhance the quality of the environment so that, to the extent possible, future generations will be ensured clean air, clean water, and a healthful environment." *See* Ind.Code § 13–12–3–1; *cf. Medical Disposal Services,* 669 N.E.2d at 1060.

As for the Oil Companies' argument that *Pantry,* 777 F.Supp. at 720–21,[10] supports the view that contribution may only be sought after corrective action costs have been incurred, we are not persuaded. The district court was not presented with the future corrective costs question. We are unwilling to accept *Pantry*'s dicta as binding precedent on this issue—especially when it is neither supported by the explicit words of the USTA nor by the legislative intent as set out in the Indiana Code.

Regarding the Oil Companies' efficiency argument, Shell and Union are concerned that if a person need not personally incur the expense of cleanup before attempting to collect contribution, there will be no incentive to seek out the most efficient method of remediation. That is, if the person doing the remediation does not have a vested interest in keeping costs down, Shell and Union worry that their money will be wasted or perhaps even used for purposes unrelated to remediation. While we understand the Oil Companies' concerns, we disagree with their solution (i.e. reading extra words into the USTA which would require remediation before seeking contribution).

Our supreme court has held, "a court of equity has the power to require that to be done which should have been done." *Walter v. Balogh,* 619 N.E.2d 566, 568 (Ind.1993). Similarly, we have stated, "[t]he trial court has full discretion to fashion equitable remedies that are complete and fair to all parties involved." *Hammes v. Frank,* 579 N.E.2d

---

**9.** We note that permitting the award of future costs is not a new concept. *See, e.g., Dayton Walther Corp. v. Caldwell,* 273 Ind. 191, 402 N.E.2d 1252, 1256 (1980).

**10.** See full *Pantry* quote in Part II, Subpart C of this opinion.

1348, 1355 (Ind.Ct.App.1991), *trans. dismissed*. We examine whether the trial court was within its discretion with its resolution of the future corrective action problem.

After the bench trial, the trial judge utilized the equitable powers granted him by the USTA to approve a practical remedy for the future corrective action problem. The trial court ordered that Shell and Union pay $2.7 million into a federally insured bank account. These funds were then ordered to be used "solely and exclusively for the environmental and human health corrective action tasks described in [the Landowners'] corrective action plans and discussed" in its September 27, 1995 decision. (R. 3986). While the Landowners were authorized to draw upon the account without notice to the trial judge or to the Oil Companies, they were required to file "detailed status reports once each calendar month," with copies served on Shell and Union, identifying the amount withdrawn, the amount remaining on deposit, all anticipated tasks and purposes for which the money would be expended, their progress in carrying out the court-ordered corrective action plans, the anticipated timetable for future corrective action tasks, and "such other information as may be relevant and useful to the Court in overseeing the implementation of the [Landowners'] corrective action plans." (R. 3986–87). As per the trial court's order, the Oil Companies can raise whatever objections they wish with respect to the implementation of the plan, misuse of the money, or other issues. If the site is remediated and funds remain, the Landowners will refund the remainder to Shell and Union.

■ The above remedy undoubtedly achieves the statutes' purposes and is a complete remedy. However, in authorizing the Landowners to draw upon the account without notice to the trial judge or to the Oil Companies, the trial court's order neither fully addresses the Oil Companies' concerns nor necessarily sets forth a fair remedy. *See Hammes*, 579 N.E.2d 1348. Therefore, to the extent the trial court's order allows the Landowners to draw upon the account without notice to the trial judge or to the Oil Companies, we conclude that the trial court

abused its discretion and that it must revise its order accordingly.

### VI. Medical Monitoring Costs

Shell and Union also contest the trial court's order requiring them to pay for the costs of implementing the Landowners' "Human Health Corrective Action Work Plan." The Oil Companies assert that the HH Work Plan, a program to monitor the future medical condition of the Landowners, is outside the scope of the USTA, thus should not be recoverable under the statute. In response, the Landowners contend that under the deferential standard of review of findings and conclusions, the trial judge's award of corrective action costs was proper. Perhaps recognizing that this is a question of law, the Landowners and their amici also cite parts of RCRA, CERCLA, the Indiana Code, and various cases in an attempt to support their view.

As previously noted, the USTA authorizes a person who undertakes corrective action in response to a release of petroleum from a UST to seek contribution for the corrective action from other persons who owned or operated the tank at the time the release occurred. Thus, the trial court's award of medical monitoring costs was proper if medical monitoring is included within the scope of "corrective action" as that term is employed in the USTA.

■ Although "corrective action" is not defined per se in the USTA, under certain circumstances, the term does include release investigation, mitigation of fire and safety hazards, tank removal, soil remediation, and ground water remediation and [ground water] monitoring. *See* Ind.Code § 13–23–9–2(b). Moreover, "[a] corrective action undertaken or required under this chapter may include an exposure assessment. The cost of any exposure assessment undertaken under this chapter may be recovered under section 8 of this chapter as part of the costs of corrective action." Ind.Code § 13–23–13–3. "Medical monitoring" is not explicitly included as a corrective action. However, the Landowners claim that medical monitoring is

an exposure assessment which is recoverable under the USTA. We disagree.

▓▓▓ An "exposure assessment," for purposes of IC 13–23, means an assessment to determine the extent of exposure, or potential for exposure, of individuals to any regulated substance from a release from an underground storage tank based on factors such as the following:

(1) The nature and extent of contamination and the existence of or potential for pathways of human exposure, including ground or surface water contamination, air emissions, and food chain contamination.

(2) The size of the community within the likely pathway of exposure.

(3) The comparison of expected human exposure levels to the short term and long term health effects associated with identified contaminants and any available recommended exposure or tolerance limits for those contaminants.

Ind.Code § 13–11–2–75. The purpose of the exposure assessment is to allow for a determination of whether a violation has occurred and what corrective action, if any, is required. *Pantry,* 777 F.Supp. at 735. As indicated by Ind.Code § 13–11–2–75, the assessment may be based on the potential for exposure of individuals to contaminants. That is, it assesses the seriousness of the site contamination and how that contamination might result in human exposure. The assessment looks at the number of persons who could be expected to be exposed, and involves a comparison of expected human exposure levels of the contaminants to the health effects generally associated with that expected exposure. An exposure assessment does not appear to contemplate baseline evaluations of individuals, subsequent periodic evaluations, cervical and breast cancer screening, thyroid function tests, X-rays, EKGs, secondary diagnostic testing, or neurotoxicological examinations as the trial court's order would provide. (R. 3041–46).

The above conclusion is bolstered by the section which provides that the commissioner may undertake corrective action "if that action is necessary, in the judgment of the commissioner, *to protect human health and the environment."* Ind.Code § 13–23–13–2 (emphasis added). Unlike release investigation, mitigation of fire and safety hazards, tank removal, soil remediation, and ground water remediation and monitoring, the battery of medical monitoring examinations on individuals as set out in the trial court's order would not serve the purpose of protecting human health as well as the environment.

Further confirmation of the above conclusion is found in the EPA's explanation of the intended use of exposure assessments in RCRA. Because the USTA's definition of "exposure assessment" was drawn almost verbatim from the UST portion of RCRA, the EPA's discussion is especially enlightening. The EPA explained:

The second approach considered by the Agency uses exposure and risk assessment techniques to determine the risk to human health and the environment at each site of an UST release. Under this option, the degree of cleanup sought for contaminated ground water and soil would reflect the site-specific risk presented.

52 Fed.Reg. 12681 (April 17, 1987). The EPA's final UST rules opted for and utilized the proposed approach in which an exposure assessment would provide site-specific information on the risks posed by the release for use in determining the appropriate corrective action for the release. 53 Fed.Reg. 37174 (Sept. 23, 1988).

Moreover, the conclusion that exposure assessment does not include medical monitoring, is supported by the Conference Report on the Superfund Amendments and Reauthorization Act ("SARA") of 1986, P.L. 99–499, House Conference Report No. 99–962, 99th Cong., 2nd Sess.1986, reprinted in 1986 U.S.C.C.A.N. 3276, 3360. SARA amended RCRA to include a corrective action program for addressing releases from petroleum USTs. The Conference Committee described the intent of exposure assessments as corrective action:

The purpose of the assessments is to determine which individuals have been exposed to the released petroleum and to aid in the design of appropriate corrective actions. Included in the assessments might

be actions such as: obtaining and analyzing air, water, and soil samples; determining the levels of petroleum substances in tap or well water; determining the direction and spread of the substances through various pathways of exposure; monitoring homes ... for vapors or other signs that the substance has migrated to a particular location; and comparing the data gathered at the site on the nature of the release and the resulting exposure to other information that is available on the effects of and risks posed by exposure to the released substances.

Conf.Rpt. at 3361. The Conference Committee then explained what corrective action did *not* include:

> [The corrective action authority of 42 U.S.C. § 6991b(h)(5) ] does not authorize a house-to-house survey to determine the health problems experienced by persons living or working in the surrounding community, nor does the language give the [EPA] Administrator the authority to conduct epidemiological surveys or toxicological tests of the substances released. Although the Administrator may conduct health surveys and studies at the site under other authorities, nothing in this section authorizes the Administrator to pursue cost recovery for such studies from the owner or operator of the tank.

*Id.*

Accordingly, we order the exclusion of medical monitoring costs from the list of recoverable corrective action costs.

### VII. Attorneys' Fees

Finally, Shell and Union contend that the Landowners failed to establish reasonable attorneys' fees. The Oil Companies contend: (1) that the attorneys' fees were inappropriate in light of the USTA's language as well as the level of success achieved; (2) that paralegal fees, Westlaw time, postage, expert witness fees, and various miscellaneous litigation expenses are not recoverable as attorneys' fees or court costs; (3) that a hearing should have been held prior to allowing sup-

plemental attorneys' fees; and (4) that the application of a multiplier was inappropriate.

■ The amount of attorneys' fees awarded is within the trial court's sound discretion, and we will reverse only where an abuse of discretion is apparent. *Stepp v. Duffy*, 654 N.E.2d 767, 775 (Ind.Ct.App. 1995), *trans. denied.* An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 180 (Ind.1993). Where the amount of the fee is not inconsequential,[11] there must be objective evidence of the nature of the legal services and the reasonableness of the fee. *Posey v. Lafayette Bank and Trust Co.*, 583 N.E.2d 149, 152 (Ind.Ct. App.1991), *trans. denied.*

### A. USTA Language

The Oil Companies argue that the USTA's provision regarding attorneys' fees should be construed narrowly. In support, they cite *Browning v. Walters*, 616 N.E.2d 1040, 1046 (Ind.Ct.App.1993), *modified on other grounds*, 620 N.E.2d 28 (Ind.1993) and *Johnson v. Naugle*, 557 N.E.2d 1339, 1345 (Ind. Ct.App.1990). They assert that a strict construction would preclude recovery for attorneys' fees for work unrelated to the successful contribution claim.

■ The USTA provides: "[a] person *who brings a successful action to receive a contribution* from an owner or operator is also entitled to receive *reasonable* attorney's fees and court costs from the owner or operator." Ind.Code § 13–23–13–8(b) (emphases added). Our Rules of Professional Conduct provide a non-exclusive list of factors to be considered when determining the reasonableness of a fee. These include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

---

**11.** Undoubtedly, an award of approximately $1.5 million in attorneys fees could not be called inconsequential.

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the result obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Ind. Professional Conduct Rule 1.5. While these factors provide useful guidelines to determine the reasonableness of an award of attorney's fees, evidence is not required on each factor. *Posey*, 583 N.E.2d at 152.

The trial court's order contains extensive discussion regarding the above factors. In summary, the trial court detailed the complexity of this case and concluded that, for the most part, the requested attorneys' fees were reasonable. The trial court determined that the Landowners' experts offered testimony that supported their requested fees, that the numerous issues of first impression made this an unusually difficult lawsuit to prepare and try, that the Landowners' attorneys' level of experience was an important factor in their success, that the rates charged per hour were customary for the market and the type of case, and that the Landowners' attorneys incurred a significant risk of non-reimbursement when they accepted this case on a contingent fee basis. Also, the trial court determined that, despite prevailing on only one of six counts, the result achieved was exceptional in that it will achieve the ultimate purpose of cleaning up the site.

■ In *Scott v. Anderson Newspapers, Inc.*, 477 N.E.2d 553 (Ind.Ct.App.1985),

*trans. denied*, a panel of this court was faced with a claim that an award of attorneys' fees and expenses was contrary to law because "[t]ime spent on unsuccessful claims, contentions and legal theories may not be assessed." *Id.* at 563. The panel responded that such an argument was "a mere invitation to us to weigh the evidence on appeal," something an appellate court may not do. *Id.* at 564. However, since then, this court has stated, "[a]n award of attorney fees is appropriately limited to those fees incurred because of the basis underlying the award." *Brant v. Hester*, 569 N.E.2d 748, 755 (Ind.Ct. App.1991); *see also Baker v. R. & R. Constr., Inc.*, 662 N.E.2d 661, 667 (Ind.Ct.App.1996), *trans. denied*, (remanding to trial court to amend its judgment in mechanics' lien foreclosure action to reflect award of attorney fees, if any, based on mechanics' lien statute alone, after appellate court reversed judgment on other theory); *Novak v. Apollo Printing and Thermography, Inc.*, 562 N.E.2d 1305, 1308 (Ind.Ct.App.1990) (affirming attorney fees award which did not include recovery of attorney fees incurred in bringing factually related claims). A plain reading [12] of the wording in Ind.Code § 13–23–13–8(b) indicates the latter approach is appropriate. That is, the USTA provides for an award of those fees reasonably incurred in bringing a successful contribution claim. The USTA does not authorize reimbursement of fees incurred in pursuing other non-USTA claims (let alone unsuccessful claims), regardless of how closely related those claims might be to the USTA claim.

■ We do recognize that work on the USTA claim may have overlapped with work on the non-USTA issues. To the extent that such overlap occurred, we would not disallow compensation for the attorneys' fees earned and costs expended. However, providing reimbursement for work done exclusively on non-USTA issues is not appropriate under the USTA.[13] In view of the failure to separate the fees according to is-

---

**12.** Our plain reading is neither narrow nor particularly broad.

**13.** In reaching this result, we are unpersuaded by the non-binding and distinguishable authority of *Zabkowicz v. West Bend Co., Div. Dart Indus-*

*tries*, 789 F.2d 540, 548 (7th Cir.1986). *Zabkowicz*, a Title VII case, concerned a court's discretion to grant reasonable attorney's fees to "the prevailing party" as authorized by 42 U.S.C. § 200c–5(k).

sues, we remand. In so doing; we note that as the party requesting assessment of attorney fees, the Landowners bear the burden of proof on this issue. *See Chrysler Motor Corp. v. Resheter*, 637 N.E.2d 837, 838 (Ind. Ct.App.1994), *trans. denied.* While a perfect breakdown is neither realistic nor expected, a reasonable, good faith effort is anticipated.

## B. Paralegal Fees and Other Costs

The Oil Companies also assert that paralegal fees, and expenses for phone, Westlaw time, postage, mileage, depositions, copies, process, and expert witnesses, are not recoverable as attorney's fees or court costs. The USTA .does not define "attorney's fees and court costs" and, judging by the variety of case law in other contexts, no plain meaning is evident. Thus, we again are faced with a novel question, and we again look to Indiana's environmental intent.

As set out in Ind.Code § 13–12–3–1, Indiana's policy is to preserve, protect, and enhance the quality of the environment so that, to the extent possible, future generations will be ensured clean air, clean water, and a healthful environment. Ind.Code § 13–12–3–1. "Being necessary for the public health, safety, and welfare, this [environmental] title shall be liberally construed to effectuate the purposes of the title." Ind. Code § 13–12–2–1. Liberally construing "attorney's fees and court costs" would further Indiana's environmental policies. Permitting a broad fee award would ensure that claims are pursued without diminishing the award in whole or in part by legal fees. Further, recovery would be an incentive to foster environmental cleanup and discourage protracted and expensive efforts to evade environmental responsibility.

Allowing recovery of paralegal fees is not unheard of when such fees are separately billed. *See, e.g., Posey*, 583 N.E.2d at 152; *Stepp*, 654 N.E.2d at 776. When one considers that attorneys utilize paralegals to perform tasks which might otherwise have to be accomplished by a lawyer with a higher billing rate, recovery for a paralegal's fees is hardly unreasonable. Regarding the other miscellaneous expenses, we are persuaded by another court's decision and reasoning in a state toxic tort case addressing the issue of the breadth of attorneys' fees.

... the phrase "reasonable attorneys' fees" in and of itself may support [an award of all reasonable out-of-pocket expenses]. In real life the attorneys' bill[s] to their clients invariably include, and request payment for, all out-of-pocket expenses reasonably attributed to the specific case. Often attorneys have advanced these out-of-pocket expenses on behalf of the client as a matter of practical and legal necessity to ensure the proper presentation of the client's position. In practice attorneys often pay these out-of-pocket expenses before they pay themselves, and consider reimbursement of same even more necessary than payment to themselves for time expended on the client's behalf. Any dichotomy in "reasonable attorneys' fees" between compensation for the attorney's time and reimbursement for the attorney's out-of-pocket expenses (or reimbursement to the client who has previously paid the out-of-pocket expenses directly) is artificial and illusory.

I can find no logic in the practice which shifts the cost of a reasonable attorney's fee when calculated on an hourly rate or contingency to the losing party, but which does not similarly shift the burden of paying those out-of-pocket expenses necessarily incurred. Were such the rule, prevailing parties who were encouraged to litigate by legislative promises of compensation for "reasonable attorneys' fees" would not be made whole and, in many instances, would not be able to undertake the litigation, much less prosecute it to a successful conclusion. Failure to reimburse expenses would often eat up whatever benefits the litigation might produce and additionally impose a back-breaking burden upon the small, but justified, litigants.

This is an access to justice issue which the Legislature has remedied through the statutory right to recover "reasonable attorneys' fees" in types of litigation which the Legislature, as a matter of public policy, has deemed especially worthy.

*Louisiana–Pacific Corp. v. Asarco Inc.*, 131 Wash.2d 587, 934 P.2d 685, 694 (1997) (Sand-

ers, J. ·concurring). Although obviously not speaking of the Indiana legislature, the above opinion is in keeping with the policy behind Indiana's environmental statutes, including the USTA.[14]

■ Accordingly, we conclude the trial court's decision as to the paralegal and other miscellaneous fees was neither clearly against the logic and effect of the facts and circumstances before it nor a misinterpretation of the law. To the extent the trial court included these expenses under "attorney's fees and court costs," it was within its discretion and we affirm its judgment. However, we point out that, like the other attorneys' fees discussed in Part VII, Subpart A, these fees must also be remanded for an appropriate separation according to issues.

### C. Hearing on Supplemental Fees

The Oil Companies next contend that the trial court's award of the supplemental attorneys' fees without a hearing was a denial of due process. In support they cite just one case: *Leibowitz v. Moore*, 436 N.E.2d 899, 900 (Ind.Ct.App.1982). The Landowners argue that the Oil Companies waived this issue, and alternatively, that the petition was well supported by evidence.

In the initial fee petition, the Landowners' counsel advised all parties that a supplemental fee petition would be submitted following the bench trial. The supplemental fee petition, which was filed with the trial court and all parties on August 23, 1995, provided billing statements for time and expenses related to the preparation for and participation in the four-day bench trial. Over thirty days later, when neither Shell nor Union had filed an objection to the supplemental petition, the trial court issued its September 27 findings of fact, conclusions of law, and judgment. On October 26, 1995, the Oil Companies filed an objection regarding the supplemental fee petition.

■ We are not particularly· persuaded by the authority of a case (*Leibowitz*) which

resulted in the issuance of three separate opinions. Moreover, we do not approve of the Oil Companies' failure to promptly object to the supplemental fee petition. However, having already concluded that a remand is in order regarding the fees and costs allowable under the USTA, we see little problem in permitting such a hearing to also address any issues related to the supplemental fee petition in this case. Further, although the USTA neither expressly mandates nor disallows a hearing in such a situation, we think the ·better practice is to use the approach employed in Trial Rule 37(B) cases. That is, in a case· of this magnitude, a hearing should be held, while in routine cases involving small amounts, a hearing may not be necessary. *See South v. White River Farm Bureau Co-op.*, 639 N.E.2d 671, 674–75 (Ind.Ct.App. 1994), *trans. denied*, (reversing and remanding award of attorneys fees where no hearing was held despite the fact that case was neither routine nor involved small amount); *Kahn v. Cundiff*, 533 N.E.2d 164, 172 (Ind. Ct.App.1989), adopted, 543 N.E.2d 627 (Ind. 1989).

### D. Multiplier

The Landowners' attorneys billed their time at their customary market rates, ranging from $100.00 per hour to $175.00 per hour. As set out in Part VII, A. of this opinion, the trial court considered the Prof. Cond.R. 1.5 factors, and then determined that the rates were reasonable. However, the court then concluded that in light of the great public benefit afforded by the Landowners' exceptional success, the delay in payment of fees, and the presence of other factors considered by the court in *City of East Chicago v. Broomes*, 468 N.E.2d 231 (Ind.Ct. App.1984), *trans. denied*, the base (or lodestar) attorney fees should be augmented by a multiplier of 1.5. Shell and Union contest this augmentation.

■ Without detracting from the Landowners' success on the USTA claim, we

---

14. Neither *Johnson*, 557 N.E.2d at 1344–45 (holding that trial court erred in awarding support staff costs as an element of reasonable attorney's fees) nor *Midland–Guardian Co. v. United Consumers Club, Inc.*, 499 N.E.2d 792, 801 (Ind.

Ct.App.1986) (stating reasonable attorney's fees includes only those amounts as paid compensation to the attorney) concerned fees authorized by an environmental statute in Indiana or any other state.

are not convinced that success on one of six counts is necessarily exceptional or remarkable success—especially considering the quality advocates involved in this case. Moreover, many of the factors considered in *Broomes* were already considered by the trial court in this case when it was determining a reasonable base fee. As such, those same factors cannot be used again to justify the application of a multiplier to a lodestar. *Kellogg v. City of Gary*, 562 N.E.2d 685, 717 (Ind.1990). The delay in payment of fees, however, is a valid concern. Yet, while we acknowledge this concern, we are reluctant to endorse the use of a rather arbitrary multiplier as a way to compensate for delay in view of the USTA's silence regarding a multiplier. Awarding interest in addition to an appropriate attorney fee and cost award is a more reasonable and logical approach to compensate for the delay in payment. Accordingly, we instruct the trial court on remand to utilize interest rather than a multiplier to address the valid delay of payment issue.

### VIII. Trademark Jury Instruction

The Landowners have one contention of their own. They argue that they are entitled to a new trial because the following jury instruction, number 21, should not have been read:

> You have heard evidence that certain names and emblems used by the defendants Union Oil Company and Shell Oil Company are federally registered and protected trademarks. Pursuant to federal law a holder of a federal trademark is required to supervise the use of the trademark in order to prevent loss of the trademark. The extent of supervision required by federal law is supervision sufficient to ensure that the trademark is not being used to deceive the public as to the quality of goods or services bearing the trademarked name. This federal law applying to trademarks, however, was not intended to create a federal law of agency and does not give the holder of the trademark control over the day-to-day operations of a service station bearing the trademarked name beyond that control necessary to en-

sure uniform quality of the products and services of that station.

(R. 1736). The Landowners claim (1) that no evidence was offered at trial concerning the registration of Shell or Union trademarks under federal law, and thus the instruction was unsupported; and (2) that the instruction constituted a misstatement of law, was misleading and tended to confuse the jury.

 The manner of instructing the jury is within the sound discretion of the trial court. *Town of Highland v. Zerkel*, 659 N.E.2d 1113 (Ind.Ct.App.1995), *trans. denied.* Instructions are to be considered as a whole and with reference to each other in determining if there is error, let alone prejudicial error. *Whisman v. Fawcett*, 470 N.E.2d 73 (Ind.1984). The giving of an erroneous instruction which is properly objected to constitutes reversible error unless the instruction does not impinge the substantial rights of the parties. *Chaffee v. Clark Equipment Co.*, 496 N.E.2d 84 (Ind.1986). In order to preserve error to an opponent's instruction, an objection must be lodged before the instruction is given. *Scott v. Krueger*, 151 Ind.App. 479, 280 N.E.2d 336 (1972). Objections to instructions must be specific and state why the instruction is misleading, confusing, incomplete, irrelevant, not supported by the evidence, or an incorrect statement of the law. *Carrier Agency, Inc. v. Top Quality Bldg. Products, Inc.*, 519 N.E.2d 739 (Ind.Ct.App.1988), *trans. denied.* The instruction becomes the law of the case when given. *Prange v. Martin*, 629 N.E.2d 915 (Ind.Ct.App.1994), *trans. denied.* A modified instruction is a new instruction for which an objection must be lodged. *See Sims Motor Transport Lines, Inc. v. Davis*, 126 Ind.App. 344, 130 N.E.2d 82 (1955) (appellant waived his objection to an opponent's instruction by not objecting to the modified instruction).

The original instruction number 21 included the following language after the portion already reproduced above:

> Therefore you are instructed that you may not conclude that a service station operator or a gasoline distributor was an agent or a servant of an oil company merely because the oil company exercised the control necessary to protect the oil company's trade-

mark by ensuring that the products and services distributed at the station were of sufficient and uniform quality.

The Landowners' counsel's objection and the relevant discussion on the instruction is as follows:

> *Landowners' counsel:* Your Honor, we would—our first objection is that I don't believe there has been any evidence in this case that Union Oil Company and Shell Oil Company are federally registered and protected trademarks. Number One. Number two, we take strong objection to the last sentence of the paragraph that instructs the jury that they may not conclude a service station operator or gasoline distributor was an agent or servant, because the oil company exercised control. I believe Shell has—Shell has a statement that is not as objectionable, it simply say, indicia of a sign is not determinative, but—

> \* \* \* \* \* \*

> Yes. And the case cited her, the *Overland v. Marlin* case—it is—it's a principle agent case, it's not a Respondeat Superior case at all. So, we would object that this is not a correct statement of the law. There's no foundation for it, there's been no evidence that these are protected trademarks and further we would not object to some—the statement made by Shell that the jury won't be prejudiced by these signs.

> \* \* \* \* \* \*

> *The Court:* What if I let everything in down to the word station and left out the conclusionary sta—

> \* \* \* \* \* \*

> Down to the word station and then delete, therefore you're instructed.

> *Landowners' counsel:* No objection, your Honor, if that will speed this process.

(R. 8169–73).

The Oil Companies claim that the Landowners' counsel's statement of no objection to the modified version of instruction 21 waived any challenge to that instruction on appeal. While this argument has technical merit, under these circumstances, to hold

that the Landowners' counsel waived any challenge to instruction number 21 would be to exalt form over substance. In this case, the trial court spent over four hours sifting through arguments regarding 125 instructions. Within that time, the Landowners' counsel objected for various reasons to the original instruction 21. One of those reasons was the last sentence. After the modification, the Landowners' counsel failed to restate objections which he apparently still had even after instruction 21 was modified. Although we do not condone the Landowners' counsel's failure to restate his objection to the modified version of instruction 21, we are not surprised given the sheer volume of instructions and the extended amount of time which passed as the parties and court completed this task. Thus, we address whether instruction number 21, as modified, was properly given.

In essence, the Landowners' counsel objected because he did not believe there was evidence that Union and Shell are federally protected trademarks, and because he did not think instruction 21 was a correct statement of the law. In an effort to show control[15] and thus liability, the Landowners introduced evidence that Shell and Union trademarks were used at the West Point station. This evidence included signs used at the station, the Union jobber agreement, and the following testimony of a Shell employee:

Q. Would it be a fair statement that today you monitor the trademark and logo?

A. Yes, absolutely.

Q. And in order to monitor, in general, what—what steps do you take to—perform that monitoring?

A. I take visual inspections of the service station outlet that Shell brand is facilitated to make sure it's clean, has clean restrooms, it's suitable appearance to the buying public.

\* \* \* \* \* \*

Q. Shell was interested in their trademark then, weren't they?

A. I think they were.

---

15. In view of our resolution in Part II, Subpart C regarding control, the Landowners' argument about the control instruction is even less compelling.

Q. And—Shell was interested in what the stations looked like, didn't they?

A. Yes.

(R. 6135–36, 6139). Consequently, we disagree with the assertion that there was no evidence on this issue.

We are likewise unpersuaded by the contention that the instruction was a confusing and improper statement of the law. *See Oberlin v. Marlin American Corp.*, 596 F.2d 1322 (7th Cir.1979) (use of a trademark alone does not create an agency relationship sufficient to impose liability on the trademark holder). Further, if the Landowners truly found modified instruction number 21 confusing or incomplete, the introduction of their own instruction would have been helpful. Accordingly, the trial court did not abuse its discretion in giving the modified version of instruction 21.

Affirmed in part, and reversed and remanded in part.

RILEY and DARDEN, JJ., concur.