# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-2737 & 09-2620

DANIEL J. WICKENS and
PAMELA WICKENS,

*Plaintiffs*,

and

MARK E. SHERE,

*Appellee,*
*Cross-Appellant*,

*v.*

SHELL OIL COMPANY and
SHELL OIL PRODUCTS COMPANY, LLC,

*Defendants-Appellants,*
*Cross-Appellees.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-CV-645—**Sarah Evans Barker**, *Judge.*

ARGUED JANUARY 19, 2010—DECIDED AUGUST 31, 2010

Before BAUER and WOOD, *Circuit Judges,* and KENNELLY, *District Judge.**

WOOD, *Circuit Judge.*  Though the parties' voluminous filings might suggest otherwise, this case had humble beginnings and there is not much left of it at this point. Pamela and Daniel Wickens owned a small shoe store in Anderson, Indiana. The store rested on a plot of land that once had been used as a Shell gas station. In 2004, when the Wickenses began preparing to sell the store and retire, they received the unwelcome news that their store rested on a bed of contaminated soil.

Not long after, the Wickenses retained Mark Shere as their attorney and began talks with Shell regarding its liability for the contamination. Their discussions centered largely on Shell's responsibilities under Indiana's Underground Storage Tank Act (the "Act"or the "USTA"), Ind. Code § 13-23-13-8. This statute provides that any person who takes corrective action to remedy damage caused by an underground storage tank may obtain a contribution from the owner or operator of the tank. Ind. Code § 13-23-13-8(b). If the party taking corrective action brings a successful suit, she is also entitled to attorneys' fees. *Id.*

Dissatisfied with the outcome of those discussions, the Wickenses filed suit on March 24, 2005. Much legal wrangling followed, but eventually the parties hammered out a settlement agreement that resolved most of the

---

* Of the Northern District of Illinois, sitting by designation.

lingering liability issues. Critically for our purposes, the agreement provided that the calculation of corrective action costs and attorneys' fees would be left to the court.

The district court granted most, but not all, of the Wickenses' requests for corrective action costs and attorneys' fees. After the court issued its decision, Shere revealed for the first time that the Wickenses' litigation team had been funded in part by Employers Fire Insurance Company ("Employers"). Shell quickly filed a Rule 60(b) motion to vacate, which the court denied. Both parties have appealed. We conclude that the district court made the best of a fractious situation and but for a small calculation mistake, we find nothing erroneous in its judgment. Thus, we affirm in part and reverse and remand in part for further proceedings consistent with this opinion.

## I

The district court's opinion provides an exhaustive account of the background to this case. See *Wickens v. Shell Oil Co.*, 569 F. Supp. 2d 770, 773-83 (S.D. Ind. 2008). Much of that detail is unnecessary to the resolution of this appeal, however, and so we limit ourselves to a brief rehearsal of the facts that remain pertinent.

Before putting their land on the market, in July 2004 the Wickenses hired HydroTech Corporation to conduct an environmental investigation of the soil. Borings revealed that the land was contaminated with pollutants that probably had leaked from an underground

gasoline storage tank. Acting pursuant to notification requirements imposed by Indiana law, HydroTech reported the leak to the Indiana Department of Environmental Management ("IDEM"). IDEM then sent a letter to the Wickenses informing them that they were responsible as the property owners for carrying out further investigations into the nature of the leak. The Wickenses responded by hiring Shere and authorizing HydroTech to pursue further investigatory work.

As part of its investigation, HydroTech examined the soil of a neighboring property owned by Richard Gardner and found that it too was contaminated. The Gardner property also had formerly hosted a gas station, but it had been affiliated with a different oil company. After HydroTech submitted its findings to IDEM, the Department sent a letter in November 2004 informing the Wickenses that they were now responsible for investigating the Gardner property as well. This proved to be a turning point in the parties' dispute; in the months that followed, they fought bitterly over the source of the contaminants and Shell's responsibility for remediating the Gardner property. Relying on HydroTech's determination that the Wickenses' property was the likely source of the contamination, the Wickenses believed that Shell should have assumed full responsibility for the entire IDEM investigation. Shell, on the other hand, found HydroTech's analysis wanting and insisted that IDEM bifurcate the investigation of the two parcels.

Unable to convince Shell to agree to the Wickenses' list of demands, Shere filed this lawsuit in March 2005. Over the course of the next year, the parties offered competing

environmental assessments and vied for control of the IDEM investigation. Bombarded with the parties' conflicting ideas for further investigations, IDEM decided that it would deal exclusively with the Wickenses as of November 2006. Making matters worse for Shell, the district court denied the company's motion for summary judgment, finding that Shell in all likelihood bore full responsibility for the contamination.

At this point, the Wickenses had a significant amount of leverage, which put Shell in a bind. As the district court put it, "[s]o long as the litigation continued and the Wickenses retained ownership of the real estate, Shere and HydroTech controlled any and all responses to the IDEM-directed investigation and remediation and could elect to continue to incur, or generate, costs that, under USTA, would be on Shell's dime." 569 F. Supp. 2d at 779-80. The parties spent a lot of time haggling over the terms of a settlement agreement, but they were unable to reach any consensus. In the meantime, Shere and HydroTech continued to rack up additional attorneys' fees and corrective action costs.

In an effort to staunch the runaway fees and promote settlement, the district court entered an order on January 9, 2007, temporarily freezing the parties' liability for each other's attorneys' and experts' fees. It instructed the parties to use this time to select a mutually acceptable independent consultant, who would investigate the property and submit a joint report to IDEM. Though the freeze was to last only three months, Shere submitted an emergency motion challenging the so-called "time-out

period," arguing that it undermined the purpose of the Act. The court was not moved to reconsider its decision, but it did leave open the possibility of recovery for fees "upon a showing of extremely good cause and clear necessity." Despite the court's warnings, the parties both continued to incur substantial expenses during this period; ostensibly, those expenses were for oversight of the work of the independent consultant. After the "time-out period" expired, HydroTech continued to work on the land pursuant to a work plan IDEM approved on March 28, 2007.

After a series of meetings with a magistrate judge, the parties eventually were able to nail down the details of a settlement agreement. Under the agreement, Shell promised to purchase the Wickenses' property for $139,900 and to pay $60,100 in "property damages." The parties stipulated that the Wickenses were entitled to attorneys' fees and corrective action costs, but they delegated to the court the job of calculating the amount of those costs.

In calculating the fee award, the district court awarded the Wickenses most of what they wanted, but it declined to award anything for attorneys' fees incurred after January 9, 2007. Shere's work after that date, the court explained, was aimed at achieving successes unrelated to the goals of the Act and thus it was not compensable. Similarly, the court refused to put Shell on the hook for HydroTech's expenses past this date, with the exception of the costs related to work devoted to carrying out IDEM's March 2007 work plan. Since the fee award was not easily ascertainable, the court decided not to award prejudgment interest.

Naturally, this was not the end. Shell filed post-judgment motions under both FED. R. CIV. P. 59(e) and 60(b). The court granted in part Shell's Rule 59(e) motion to modify or alter the judgment by deducting fees that Shere received for the legal services attributable to his wife, Colleen Shere. Although Colleen Shere had once been licensed to practice law in Indiana, she had allowed her law license to lapse. The court concluded that Shere had improperly billed her hours as attorney services and thus those amounts should not have been included in his award. After this deduction, the Wickenses received $391,307.83 in attorneys' fees and $116,511.27 for corrective action costs.

Shell's Rule 60(b) motion asked the court to vacate its judgment on the ground that Shere had fraudulently concealed Employers's role in funding a large part of the Wickenses' litigation efforts. The district court admonished Shere for failing to disclose his relationship with Employers when the issue of fee arrangements was discussed at a recent hearing. Nevertheless, the court concluded that Shere's evasiveness did not warrant relief under Rule 60. Shell has appealed. After the district court granted Shere's motion to allow him to appear in the case in his own name as the real party in interest, Shere has cross-appealed. (We are not concerned here about the ability of any creditor of the Wickenses to reach those funds, *cf. Astrue v. Ratliff,* 130 S. Ct. 2521 (2010) (holding that an award of fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), is payable to the litigant, not to the attorney, and thus is available to offset a debt to the government); as no one

has challenged the district court's decision to allow Shere to appear as the party-in-interest, we have no further comment about it.)

**II**

To a great degree, the issues on the appeal and cross-appeal overlap. Shell and Shere both attack the district court's calculation of attorneys' fees and corrective action costs. Shere thinks that the court should not have used a cut-off date at all, and both parties dispute the particular date the court selected. Shere also contests the district court's treatment of fees attributed to Colleen Shere's work and the court's tabulation of his bills.

Whatever the size of the attorneys' fees and corrective action costs award, Shere contends that he is entitled to prejudgment interest. For its part, Shell argues that the district court's decision should have been tossed out under Rule 60(b) because Shere misrepresented his fee arrangement. Lastly, Shere quarrels with the district court's findings that are critical of his professionalism and candor. We address each issue in turn and apply the law of Indiana, as this case is based on the diversity jurisdiction.

A

Though trial courts are given wide latitude in formulating awards of attorneys' fees, their discretion is cabined in a few important respects. Indiana courts look

for guidance to a series of common-sense factors set out in the state's Rules of Professional Conduct. See Ind. Rules of Professional Conduct 1.5(a) (discussing things like customary fees for similar legal services, time, and labor required). When the parties haggle over the number of attorney hours billed, Indiana courts permit the judge to take into account the "responsibility of the parties in incurring the attorneys' fees." *Weiss v. Harper*, 803 N.E.2d 201, 208 (Ind. Ct. App. 2003). For cases relying on the Underground Storage Tank Act, a court must also be careful to allocate attorney hours to each particular cause of action, because a court cannot "authorize re-imbursement of fees incurred in pursuing . . . non-USTA claims . . . , regardless of how closely related those claims might be to the USTA claim." *Shell Oil Co. v. Meyer*, 684 N.E.2d 504, 524 (Ind. Ct. App. 1997); *summarily affirmed in relevant part*, 705 N.E.2d 962, 981 (1998).

Noting that the Act protects only a narrow right to contribution from an operator for corrective action costs, the district court concluded that the statutory purpose is satisfied "once a defendant accepts its legal obliga-tion and agrees to assume responsibility for remediating the site." *Wickens*, 569 F. Supp. 2d at 791. After this point, any further action by the plaintiff's attorney logically must relate to claims outside the scope of the Act for additional damages or indemnification. Applying its statutory-purpose test, the district court selected Janu-ary 9, 2007, as the date after which Shere's efforts were no longer focused on obtaining relief under the Act and thus were not recoverable from Shell. By January 9, 2007,

Shell had offered to cover all of the Wickenses' past and future corrective action costs; all that remained, the district court explained, were claims outside the scope of the Act for additional damages and attorneys' fees.

As the parties have raised objections to various aspects of the district court's decision on fees, it is helpful to clarify the standard of review that pertains to each issue. We review *de novo* the district court's legal analysis and methodology, which includes its decision to employ an approach based on statutory purpose. *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000). The application of that test, assuming that it is the correct one, is subject to a more lenient abuse-of-discretion standard. *Anderson v. AB Painting and Sandblasting, Inc.*, 578 F.3d 542, 544 (7th Cir. 2009).

We begin with the fundamental question whether the court's use of the statutory-purpose test was permissible. Rather than looking at purpose, Shere contends that the Act permits reimbursement of all fees that contribute to the plaintiffs' success. In so arguing, he relies on the following statement in the statute: "A person who brings *a successful action* to receive a contribution from an owner or operator is also entitled to receive reasonable attorney's fees and court costs from the owner or operator." Ind. Code § 13-23-13-8(b) (emphasis added). Shere contends that the district court ignored significant legal victories that he achieved for his clients after January 9, 2007. This argument, however, entirely ignores the fact that the Indiana courts have interpreted the statutory language to be limited to claims under

the Act; in *Meyer*, the court expressly held that fees may not be awarded on the basis of non-Act claims. 684 N.E.2d at 524. The district court was therefore correct to disregard the fact that the Wickenses received a large lump-sum payment from Shell or that Shell promised to indemnify the Wickenses for tort liability related to the contamination.

Shere also complains, relying on *Anderson*, 578 F.3d at 545, that the district court's approach to attorneys' fees was inappropriately guided by its concern that the parties' litigation costs were disproportionate to the value of the Wickenses' property. The record, however, does not support this accusation. Shere points to only a few instances where the court made an off-hand reference comparing the relative size of the settlement with Shere's attorneys' fees request. At most, these comments might indicate that the court momentarily lost sight of the large projected cost of future corrective action. The court's remarks do not, however, imply that it calculated its fee award using an inappropriate proportionality analysis. The only reasonable inference from the record is that the dispositive factors were the time when the fees were incurred and their relation to the Wickenses' claims under the Act, and nothing else.

The court's decision to rely on the purpose behind the Act was therefore supported by Indiana law and not otherwise objectionable. The more difficult question—or at least the question to which the parties have devoted more energy—relates to the court's selection of a date by which the statutory purpose was fully satisfied. The

court used January 9, 2007, as the appropriate cut-off date. Shell suggests three earlier alternative dates as better choices: January 13, 2005; August 21, 2006; or November 21, 2006. Shere, not surprisingly, urges us to choose a later date.

We consider first whether it was an abuse of discretion to choose any date later than January 13, 2005, when Shell's attorney allegedly offered to remediate the Wickenses' property and to respond in good faith to IDEM. Assuming that Shell did in fact make this offer, a fact Shere contests, the district court found that Shell's refusal to take responsibility for the Gardner property was an abdication of the duties the company owed to the Wickenses under the Act. IDEM, recall, had combined both pieces of property into a single investigation, and the district court found that the state agency's action effectively made the Wickenses responsible for the Gardner property. Under those circumstances, it would not make any sense for the Wickenses to agree to limit Shell's liability solely to their own property when they believed that Shell should also be on the hook for the liability the Wickenses faced because Shell's tanks allegedly caused harm to the Gardner property.

Shell contends that the Act does not require it to take responsibility for another person's property and thus that attorneys' fees were not available for this part of the Wickenses' case. The Act, however, specifically provides that any person who either voluntarily or by order from IDEM undertakes corrective actions "is entitled to receive a contribution from a person who owned or

operated the underground storage tank." Ind. Code § 13-23-13-8(b). This language shows that it is irrelevant under the Act whether the person ordered to take action owns the property, and thus that Shell's argument cannot prevail.

The district court also erred, Shell asserts, when it found that the Wickenses "lacked the power . . . to accept Shell's partial acceptance of responsibility" in January 2005. Because the Act allowed the Wickenses to recover a "contribution" from Shell, Shell reasons that the Wickenses had the ability to accept Shell's offer to cover a portion of the liability. Though this is obviously true, it is beside the point. The Wickenses had a right under the Act to hold Shell liable for the full extent of the corrective action costs they owed, and that amount was greater than the offer Shell was making at the time.

Shell's first fallback position from its preferred date of January 2005 is August 21, 2006, which is when it submitted its Further Site Investigation work plan to IDEM. Shell asserts that a few months earlier, on March 13, 2006, it informed IDEM that it would take responsibility for the Wickenses' property. Delivery of the work plan, it continues, was the final step needed to take full responsibility under the Act. The district court rejected this alternative date because Shell's work plan was neither approved by IDEM nor accompanied by an express commitment to indemnify the Wickenses for future corrective action costs. Indeed, at that time Shell was still contending that some of the contamination on

the Wickenses' property was attributable to the other company's tanks on the Gardner lot.

In contesting the district court's conclusion, Shell argues that IDEM's rejection of its work plan is irrelevant to the fee inquiry, intimating that it was sufficient for Shell to make a good-faith effort to comply with IDEM's directives. Even if this were true—and we are not saying that it is—the district court was entitled to find that Shell had not met even that more modest standard. Notably, as of August 21, 2006, Shell still had not promised to cover the Wickenses' corrective action costs. Indemnifying the Wickenses for these costs, Shell counters, is outside the scope of the Act because "indemnification and statutory contribution" are "two separate theories." *Bourbon Mini-Mart, Inc. v. Gast Fuel Services, Inc.*, 783 N.E.2d 253, 257 (Ind. 2003). *Bourbon Mini-Mart,* however, does not help Shell, because in that case the court was drawing a distinction between indemnification for tort claims and liability under the Act. *Id.* at 256-57. The Wickenses' request for indemnification against future corrective action costs deals strictly with the liability imposed pursuant to the Act. As the Act permits plaintiffs to recover future corrective action costs, there is no impediment to seeking indemnification under its terms. *Meyer*, 684 N.E.2d at 520-21.

Shell's final fallback date is November 21, 2006, the day when it offered "to pay 100% of the past and future corrective action costs at the Wickens property, to indemnify the Wickens and any future owners or tenants of

the property against these costs . . . , and to pay reasonable costs of litigation as determined by the Court." Though the district court admitted that "[Shere's] efforts at this point to collect attorneys' fees and repayment of costs from Shell clearly appear to be driving the litigation," it recognized that negotiations over attorneys' fees was "routine" and nothing indicated that Shere's actions in prolonging the litigation at this stage were unreasonable. Shell's refusal to accept the magistrate judge's December 2006 settlement proposal, the district court reasoned, implied that Shell too was responsible for the continuation of the litigation.

Shell comes closest to a reasonable position with this argument, but we are satisfied that the district court did not abuse its discretion when it rejected this option as well. As the court noted, this offer did not resolve the issue of the precise amount of costs and fees that Shell would assume. Shere responded to it with an email dated November 30, 2006, in which he did propose specific numbers, but Shell rejected that counteroffer. The district court took the position that Shell's November 21, 2006, offer did not effectively resolve the case; there is no rigid rule saying that offers to litigate must be accepted. See *Moriarty v. Svec & Sons Funeral Home*, 233 F.3d 955, 967-68 (7th Cir. 2000) (noting that a settlement offer is only one of many factors to be taken into consideration when awarding attorneys' fees). Though the fees awarded by the court are required to be reasonable, counsel may legitimately hold out for a better deal (for at least some time) because fee litigation is costly and often is not reimbursed as part of the fee award.

Having disposed of Shell's challenges to the district court's choice of January 9, 2007, as the cut-off date, we turn now to Shere's arguments for a later date. Shere criticizes the district court's decision because it was based in part on the court's earlier "time-out" order temporarily limiting attorneys' fees. That order, Shere asserts, conflicted with the fee-shifting provisions in the Act. As detailed above, the district court permitted Shere to recover fees incurred after Shell's November 21, 2006, settlement offer, because it recognized that Shere needed some time to try to tie up the last few details of a full settlement. But the court was entitled to force an end to that process, and that is just what it did by determining that on January 9, 2007, it would not wait any longer for the parties to resolve the fee dispute. In fact, the court was more generous than this, since it restricted fees for only 90 days while the litigation was on pause. There was thus little reason for Shere's hyperbolic emergency motion to reconsider the imposition of the "time-out" period. The court saw Shere's overblown reaction as evidence that by this time he was unnecessarily expanding the scope of the IDEM investigation.

Shere also challenges the district court's decision to deny fees related to the work he did after January 9, 2007, drafting the settlement agreement. The costs associated with putting an agreement into writing would have been incurred even if the Wickenses had agreed to settle before January 9, 2007. The district court did, however, award Shere fees for the month and a half after Shell offered to litigate the fee award in court. This, the court was entitled to conclude, was enough. The same

reasoning applies to Shere's contention that he should have been awarded fees for his work in litigating his fee petition. The district court did not abuse its discretion when it chose not to sort through Shere's bills to calculate how many hours were devoted solely to finalizing the settlement agreement or litigating the fee dispute.

The cut-off date is not the only bone of contention Shere has with the district court. He also objects to the court's decision to grant Shell's Rule 59(e) motion requesting that Colleen Shere's fees be deducted from his fee award. (The award did not identify Colleen Shere as the recipient of these fees; instead, they were folded into Shere's own award.) The district court explained that these fees could not be recovered because Colleen Shere was not a licensed attorney and thus was not authorized to bill her services as an attorney under Rule 5.5 of the Indiana Rules of Professional Conduct.

On appeal, Shere contends that Colleen Shere's work was cost-effective and consistent with the practice of unlicensed attorneys temporarily working under the supervision of other attorneys while they seek an Indiana license. Yet, as the district court pointed out, Colleen Shere was not actively trying to reinstate her license. Nothing prevented Shere from simply billing Colleen Shere's time using some non-attorney designation.

Shere notes that even if the district court properly excluded the fees associated with Colleen Shere's work product, the court made a small calculation error that should be corrected. In its August 2008 final judgment

order, the court awarded 89% of Colleen Shere's fees, because it determined that 11% of all attorneys' fees incurred prior to January 9, 2007, were devoted to the pursuit of claims not covered by the Act. Later, in its ruling on Shell's Rule 59 motion, the district court subtracted $9,275, which constituted 100% of the fees Shere originally requested for Colleen Shere's work. This appears to have been a clerical error that cost Shere $1,020.25; thus, this error should be corrected on remand.

Relatedly, Shere claims that the district court's fee award failed to account for $5,419.23 in disbursements. He draws this court's attention to a series of bills and receipts in the record that purportedly support this claim. Given the complexity of the bills involved and the need to apportion pre- and post-cut-off date costs, it is startling that Shere failed to present evidence linking up individual billing entries with his total calculation. This court will not do Shere's work for him, especially when our review of the materials indicates that it is likely that Shere made several miscalculations. Without a better showing from him, we will assume that the district court did its job properly when it decided to award $37,443.25 in litigation costs and disbursements.

B

Attorneys' fees are not the only topic on appeal. Shell also takes issue with the district court's decision to award the Wickenses costs related to the environmental testing that HydroTech conducted in May and June 2007. While the court felt that HydroTech and Shere

were by then unnecessarily expanding the scope of the IDEM investigation, it concluded that the Wickenses were nonetheless entitled to these costs because they were incurred pursuant to an IDEM-approved plan. This decision, Shell asserts, incorrectly presumed that IDEM officially approved HydroTech's plan. Furthermore, as none of HydroTech's data was ever supplied to IDEM, Shell says that it is beyond the pale to reimburse the Wickenses for useless work. The court's approach to corrective action costs was irreconcilable, in Shell's view, with its decision denying attorneys' fees covering the same period. It was Shere, Shell argues, who pushed for the expanded March 2007 work plan.

We review a district court's award of damages under the deferential clear error standard, *Int'l Production Specialists, Inc. v. Schwing America, Inc.*, 580 F.3d 587, 598 (7th Cir. 2009), and Shell has not come close to upsetting our confidence in the district court's decision. Shell's representation that IDEM never approved HydroTech's work plan is misleading. In fact, IDEM conditionally approved the work plan and ordered HydroTech to commence further investigation or risk being subjected to civil penalties.

The fact that HydroTech never submitted the data to IDEM is almost certainly a result of the magistrate judge's order on July 18, 2007, barring the parties from engaging in any further corrective action. Though HydroTech may have finished testing by that time, it may still have been compiling its data and working on a report. Before the magistrate judge's order was lifted, the

parties settled. At that point, HydroTech ideally should have handed over what it had to IDEM, but it is hard to blame it for inaction when it no longer would be compensated for its time. (Shell apparently has no interest in HydroTech's data.)

There is admittedly some tension between the district court's treatment of corrective action costs and its handling of attorneys' fees. Even so, the district court could reasonably have believed that carrying out a sensible (albeit expansive) investigation as ordered by IDEM was less blameworthy than prolonging the litigation past January 2007 by using the Wickenses' control of the investigation as leverage over Shell. Thus, we see no error in ordering Shell to pay for the corrective action costs incurred in May and June 2007.

C

In his cross-appeal, Shere also argues that the district court erred when it denied his request for prejudgment interest on the attorneys' fees and corrective action costs awarded. Under Indiana law, prejudgment interest is warranted if the damages are "ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time the damages accrued." *Cincinnati Ins. Co. v. BACT Holdings, Inc.*, 723 N.E.2d 436, 441 (Ind. Ct. App. 2000) (internal quotation marks omitted). Though damages must typically be subject to "simple mathematical calculation," courts have awarded prejudgment interest "even where some degree of judgment must be used to measure damages." *Hayes v. Chap-*

*man*, 894 N.E.2d 1047, 1054 (Ind. Ct. App. 2008). Thus, an attorney may recover prejudgment interest for bills related to litigation even though her client disputed the bill and the court rejected the attorney's proposed hourly rate. *Community State Bank Royal Center v. O'Neill*, 553 N.E.2d 174, 177-78 (Ind. Ct. App. 1990) (applying general rule to attorneys' fees).

Nonetheless, "[d]amages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest." *Whited v. Whited*, 859 N.E.2d 657, 665 (Ind. 2007) (internal quotation marks omitted). As the district court found that the corrective action costs and attorneys' fees were reasonably contested, it declined to award prejudgment interest. We review this decision for an abuse of discretion. See *Twenhafel v. State Auto Prop. and Cas. Ins. Co.*, 581 F.3d 625, 630-31 (7th Cir. 2009).

We are tempted to say that Parts II.A and II.B of this opinion show conclusively that the awards here were subject to dispute and thus not eligible for prejudgment interest under Indiana law. We will nonetheless address Shere's argument briefly. First, the decision in *Meyer* does not mandate the imposition of prejudgment interest. The court there approved the award of interest only as a better alternative to the trial court's use of a lodestar-multiplier to capture its concern about the delay in payment. *Meyer*, 684 N.E.2d at 526-27. Furthermore, the attorneys' fees in *Meyer* were much more easily calculable than in this case: in order to distinguish between claims within and outside the Act, the court had only to review the billing records or apply a simple apportionment formula. *Id*. at 524-25; see also *O'Neill*,

553 N.E.2d at 177-78 (routine dispute over hourly rate). In contrast, the district court here could not begin to calculate fees or costs until it had determined the precise point at which the goals of the litigation shifted away from pursuing the Wickenses' claim under the Act. See *Whited*, 859 N.E.2d at 665 (denying claim for prejudgment interest because of complex damages calculations); *Hammes v. Frank*, 579 N.E.2d 1348, 1357 (Ind. Ct. App. 1991) (same). This methodology involved more than a "simple mathematical calculation," and so the district court did not abuse its discretion in denying Shere's request for prejudgment interest.

### D

Finally, Shell argues that the district court's judgment should be vacated pursuant to Federal Rules of Civil Procedure 60(b)(3) because Shere failed to disclose Employers's role as a major source of the Wickenses' litigation funds. Though the district court faulted Shere for not revealing his relationship with Employers, it decided that Shere's conduct did not warrant the relief requested. We review the district court's decision denying Shell's Rule 60(b) motion for an abuse of discretion. *Musch v. Domtar Industries, Inc.*, 587 F.3d 857, 861 (7th Cir. 2009).

Rule 60(b)(3) provides that a court may set aside a judgment if a party engaged in "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." To obtain relief under Rule 60(b)(3), a party must show that she has a

meritorious claim that she was prevented from "fully and fairly presenting" at trial as a result of the adverse party's fraud, misrepresentation, or misconduct. See *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 536 (7th Cir. 2003); *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995). "It is well-established that Rule 60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances." *Dickerson v. Board of Educ.*, 32 F.3d 1114, 1116 (7th Cir. 1994) (internal quotation marks omitted). Rule 60(b)(3) does not, however, displace a judge's power to set aside a judgment for fraud on the court. FED. R. CIV. P. 60(d)(3). Fraud on the court is actionable only if it prejudices the adverse party. See *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Washington, Inc.*, 127 F.3d 574, 578 (7th Cir. 1997). A party seeking to set aside a judgment under Rule 60(b)(3) or the court's inherent power must prove fraud by clear and convincing evidence. See *Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008); *Lonsdorf,* 47 F.3d at 897.

Shell contends that Shere hid Employers's role in the litigation in violation of its obligation under the Federal Rules of Civil Procedure to disclose insurance arrangements. The rules provide that a litigant must automatically disclose "any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment." FED. R. CIV. P. 26(a)(1)(A)(iv). Given Employers's involvement as the insurance company funding the litigation, the district court concluded, as do we, that Shere appears to have evaded his responsibilities.

The choice of a proper sanction for violations of the discovery rules, however, lies in the discretion of the district court. Here, the court reasonably drew a line between an apparent discovery violation and fraud. In its Rule 60(b) motion, Shell has not come close to showing by clear and convincing evidence that the district court erred and that Shere's actions were fraudulent in nature. Furthermore, Shell suffered no prejudice as a result of Shere's misrepresentations. Though the district court criticized Employers for doing little to control the costs of litigation, Shell's knowledge of Employers's role would not have changed anything. Shell's assertion that it would have reached a different settlement if it knew about Employers's "deep pockets" may even cut against it. In that situation, Shell might have offered a larger settlement, thinking that it could not simply wait until the Wickenses' funds ran out.

E

Shere devotes a significant portion of his brief to contesting a number of the district court's findings that portray him in a less than favorable light. But his request shows why we cannot do anything about this. He says, in his brief, that "this appeal also concerns pages of dicta, partially and ambiguously withdrawn, in which the district court gave scathing treatment to hard-earned professional reputations. The undersigned respectfully requests that this Court vacate and remand the district court's orders to allow this dicta to be corrected." Even if the district court had formally found

misconduct, an appeal is not the proper remedy. See, *e.g.*, *Seymour v. Hug*, 485 F.3d 926, 929 (7th Cir. 2007) (explaining that attorneys can only appeal monetary sanctions). What Shere does not mention is that the district court was, in many places, equally critical of Shell's approach to this case, and that it had some complimentary things to say about Shere. We sit to review judgments, not particular language in district court opinions, and Shere will have to be satisfied with our decision on the merits, which is largely favorable to him.

\* \* \*

We REVERSE the district court's judgment insofar as it miscalculated when it deducted Colleen Shere's fees from Shere's attorneys' fees award and REMAND for further proceedings consistent with this opinion. We AFFIRM the remainder of the district court's judgment.